**SMITH, Appellee,**

v.

**SMITH, Appellant.**

[Cite as *Smith v. Smith,* 182 Ohio App.3d 375, 2009-Ohio-2326.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 2008 CA 37.

Decided May 15, 2009.

Joseph A. Coates, for appellee.

Terry L. Lewis, for appellant.

DONOVAN, Presiding Judge.

{¶ 1} This matter is before the court on the notice of appeal of Freda Smith, filed April 28, 2008. Freda and her husband, Timothy Smith, were married June 22, 1997, and on October 5, 2006, Timothy filed a complaint for divorce. No children were born of the parties' marriage. The trial of the parties' divorce began on July 6, 2007, and concluded on September 14, 2007.

{¶ 2} On October 26, 2007, the trial court issued an entry on marital residence, pursuant to which Timothy was ordered to refinance the parties' marital home

and issue a check to Freda in the amount of $5,450, her share of the equity in the residence, less one-half of the cost of the court-ordered appraisal. The entry further provides, "Wife shall have fourteen days to vacate said property from the time of the closing on the refinancing of the marital residence, and shall be allowed to remove any and all personal items, personal belongings, and personal property."

{¶ 3} On January 30, 2008, Freda filed a motion to increase temporary spousal support. Attached to the motion is an affidavit indicating that Freda "recently" vacated the marital home and that her expenses are "much different." The trial court overruled the motion the same day, and its entry provides, "The Court anticipates the Final Decree of Divorce will be filed shortly. Any inequities in spousal support will be addressed in the Final Decree."

{¶ 4} On April 1, 2008, the trial court issued a judgment entry and final decree of divorce. The final decree provides

{¶ 5} "1. Marital Residence—The marital residence is AWARDED to the Plaintiff. The Court finds the real property is valued at $134,00.00. The parties owe $122,800 on the mortgage. Each party is AWARDED on[e] half of the equity or $5,600.00 each. The Plaintiff will refinance the real property within sixty (60) days of this entry's time-stamped date and pay the Defendant $5,600.00, representing her equity award in the property * * *.

{¶ 6} " * * *

{¶ 7} "2. Spousal Support After considering the factors listed in R.C. 3105.18(C)[,] the Court finds that spousal support is neither reasonable nor appropriate for this case. Defendant's request for spousal support is **OVER-RULED**.

{¶ 8} "**JUDICIAL INTENT REGARDING SPOUSAL SUPPORT** Pursuant to statute, the court has divided the parties' marital assets, including pension rights, and liabilities, prior to considering the award of spousal support.  * * * The issue of spousal support shall be subject to the continuing jurisdiction of the court for purposes of establishment, termination, or modification in both amount and duration, in the event that either party obtains relief in any bankruptcy court from any obligation, including pension obligations, due directly to the other party, or obtains relief from any debt which either party must as a result of the relief pay, or which effectively modifies the property division between the parties, thus affecting the need for support by either party.

{¶ 9} " * * *

{¶ 10} "10. Personal Property—During the hearing a coin was tossed with Plaintiff winning the right to choose the first piece of contested personal property listed on Joint Exhibit 1. This exhibit was submitted by the Defendant. The

Defendant was instructed from the bench to submit a clean copy of Joint Exhibit 1 to the Court so that it could be made a part of the record and be used to divide the contested items. She has failed to submit the exhibit and the Court has nothing before it at this time to use as a master list. Therefore, each party is awarded the personal property in his or her care."

{¶ 11} Freda asserts two assignments of error. Her first assignment of error is as follows:

{¶ 12} "The trial court abused its discretion when it did not make findings of fact under O.R.C. § 3105.171(F) and distributed property based upon a failure of an attorney to file a 'clean' joint exhibit."

{¶ 13} Freda argues, "The Court set forth no factual basis for awarding the marital residence to the Appellee. Although the division appears to be equitable, the failure of the court to set forth some factual findings as to its reasoning, the Court's award of the marital residence to the Appellee was inappropriate." Freda further argues that the parties had an agreement regarding the division of most of their household goods, but as she was only allowed to remove her personal belongings from the marital residence, Timothy "received all of the household goods and furniture due to the Appellant's failure to provide the Court with a clean joint exhibit."

{¶ 14} Timothy argues in response that Freda was not awarded the marital residence because she was unable to obtain financing and that the parties have since divided their personal property that was not in dispute. According to Timothy, "if this Court does see the need to remand on this issue, as a practical matter the 'clean' exhibit would now be a small list of less than $500.00 worth of property and not the original list requested by the Trial Court."

{¶ 15} In Ohio, "[m]arital property is defined as any real property, personal property, or interest therein that is owned by either or both spouses that [was] acquired by either or both spouses during the course of their marriage. R.C. § 3105.171(A)(3)(a). 'A trial court is vested with broad discretion when fashioning [the] division of marital property.' *Bisker v. Bisker* (1994), 69 Ohio St.3d 608, 609, 635 N.E.2d 308, citing *Berish v. Berish* (1982), 69 Ohio St.2d 318 [23 O.O.3d 296], 432 N.E.2d 183.

{¶ 16} "Accordingly, an appellate court will uphold a division of marital property absent a determination that the trial court abused its discretion. * * * 'An abuse of discretion is more than an error of law or of judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable.' *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219 [5 OBR 481], 450 N.E.2d 1140. When applying an abuse of discretion standard, the appellate court is not free to simply substitute its judgment for that of the trial court. *Berk v.*

*Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301. A trial court has broad discretion to determine what property division is equitable in a divorce proceeding. * * * The mere fact that property division is unequal, does not, standing alone, amount to an abuse of discretion." *Shehata v. Shehata,* Montgomery App. No. Civ.A. 20612, 2005-Ohio-3659, 2005 WL 1685099, ¶ 10–11, citing *Cherry v. Cherry* (1981), 66 Ohio St.2d 348, 20 O.O.3d 318, 421 N.E.2d 1293.

{¶ 17} R.C. 3105.171 provides:

{¶ 18} "(C)(1) Except as provided in this division or division (E) of this section, the division of marital property shall be equal. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section.

{¶ 19} " * * *

{¶ 20} "(F) In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:

{¶ 21} "(1) The duration of the marriage;

{¶ 22} "(2) The assets and liabilities of the spouses;

{¶ 23} " * * *

{¶ 24} "(4) The liquidity of the property to be distributed;

{¶ 25} "(5) The economic desirability of retaining intact an asset or an interest in an asset;

{¶ 26} "(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

{¶ 27} "(7) The costs of [the] sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

{¶ 28} "(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

{¶ 29} "(9) Any other factor that the court expressly finds to be relevant and equitable."

{¶ 30} Regarding the marital residence, at the hearing in September, Freda testified that she had obtained "pre-approval" for a loan to refinance the home, but she acknowledged that she could still be turned down for the loan. She also testified that her "pre-approval" had expired. Freda testified, "Until I'm divorced I really can't purchase the home. It is not up for sale yet."

Timothy, in contrast, testified that he had obtained loan approval at the time of the September hearing. The record reveals that the trial court determined the value of the home, as well as the debt remaining thereon in the first and second mortgages, and that Freda was awarded her share of the equity. Freda does not dispute the trial court's calculations, and because the property has been equitably divided, we cannot determine that the trial court abused its discretion in awarding possession of the home to Timothy, who was clearly able to obtain the needed financing.

{¶ 31} Regarding Freda's arguments as to the trial court's division of property within the home and Joint Exhibit 1, the following exchange occurred during Timothy's direct examination on July 6, 2007:

{¶ 32} "Q. Personal belongings. There is a laundry list of things. I guess if you want to go through, what would you like out of the home in terms of personal property?

{¶ 33} "A. We agreed once before and basically there is a room that I spend most of my time in and the furniture, T.V. and then the, you know, VCR are associated, you know, CD player in there. We agreed that I would keep that and she could take the living room furniture from the other room. * * *

{¶ 34} "Q. * * * we might as well go room-by-room.

{¶ 35} "A. * * * well, the front room and what you call the family room. All the furniture in the family room I would retain.

{¶ 36} "The furnishings in the front room she was going to take. I had agreed to that minus the curio cabinet that I bought at Cedar Hill Furniture in Centerville a few years ago.

{¶ 37} "Next is the room she referred to as Great Pappie's Room. That's where my Dad would stay when he came down. There is a dresser in there I had prior to our marriage, she had no problem with me keeping that. There's a Queen size bed, * * * mattress and box springs and Hollywood frame we bought for company. There was a brass headboard that was in there that neither one of us really wanted. But pretty much all of the furnishings in that room would stay with me.

{¶ 38} "The next bedroom would be the one that our granddaughter used and that is mostly, there's a twin bed, entertainment center, end table, lamps, kind of things in there that she said she was going to take for the granddaughter to use. I have no problem with that.

{¶ 39} "The master bedroom I was in contention for quite awhile. * * *

{¶ 40} "THE COURT: There's a whole lot of settlement discussion in here that's useless.

{¶ 41} "MR. COATES: Your Honor, like I said before, I thought—we were about 95 percent through the personal property.

{¶ 42} "THE COURT: Well, that went out the window.

{¶ 43} "MR. COATES: But there was like—my understanding when we were coming in here today we had a handful of personal property items left to dispute over and that was it. So there was about six or seven things, and—

{¶ 44} "THE COURT: Well, all that stuff flew right out the window, Mr. Coates.

{¶ 45} " * * *

{¶ 46} "THE COURT: We don't have any agreement here, so.

{¶ 47} " * * *

{¶ 48} "THE COURT: Does somebody have a list of the property; an inventory of all this stuff? Mr. Barbato is shaking his head yes he's got one.

{¶ 49} " * * *

{¶ 50} " * * * is it marked as far as premarital, marital or—

{¶ 51} "MR. COATES: It's kind of marked. It is not marked premarital. * * * but I guess who was going to take what or what things were agreed to and may not agreed to, so—

{¶ 52} "THE COURT: Once again, agreements have flown out the window so is there any reason why we don't take that list just flip the coin and the parties can do the choosing off the list? * * *

{¶ 53} " * * *

{¶ 54} "THE COURT: Normal procedure is when there's personal property issues, we have a list which apparently we have, we flip a coin and at some point in the future the two of you get together and you start choosing. Whoever wins the toss chooses first, you mark it off the list. That's the normal procedure.

{¶ 55} " * * *

{¶ 56} "THE COURT: Settlement negotiations prior to hearing today are irrelevant and actually improper for each to bring up in here.

{¶ 57} " * * *

{¶ 58} "THE COURT: You can't do that. You didn't get it settled.

{¶ 59} " * * *

{¶ 60} "THE COURT: We're doing this in a contested manner. So if somebody has a list we'll just mark it as a Joint Exhibit. * * *

{¶ 61} "MR. COATES: Everything we've got on it has been written on quite a bit unfortunately, * * *

{¶ 62} " * * *

{¶ 63} "THE COURT: Who created the list?

{¶ 64} "MR. BARBATO: We did.

{¶ 65} "THE COURT: Do you still have it on a computer somewhere?

{¶ 66} "MR. BARBATO: * * * She's got it on the computer.

{¶ 67} "THE COURT: We'll get a clean copy and get to your counsel so he can give it to Mr. Coates and so he can confirm that you didn't change anything on the list before you sent it over. And then we'll mark it as a Joint Exhibit, Exhibit Number 1."

{¶ 68} The court then flipped a coin with a "P" on one side and a "D" on the other, and when the "P" side of the coin was revealed, the court indicated that Timothy, the plaintiff, won the coin toss and would accordingly choose first among the disputed property, followed by Freda.

{¶ 69} During her direct examination on July 6, 2007, Freda indicated that the list she compiled contained only items in the house and that there were items in the garage that were not on the list. According to Freda, the garage contained certain tools that were her premarital property.

{¶ 70} Having reviewed the record, we conclude that it suggests, consistent with the parties' assertions and contrary to those of the trial court, that only a few items of property within the marital residence were in dispute. For example, Timothy acknowledged at the final hearing that he agreed that Freda could have the furniture in certain rooms of the home, yet the trial court ignored this agreement, determining that it was "out the window" and directing the parties to proceed with a coin toss. Freda admits that she prepared an inventory of the parties' property, and she acknowledges that the trial court instructed her to provide the list to Timothy's counsel and the court. Freda did not object to the alternate selection of property directed by the trial court. It appears from the record, however, that Timothy was subsequently awarded all of the parties' property in the home because of Freda's failure to submit the list of inventory. In other words, in awarding the marital residence to Timothy, the trial court allowed Freda to remove only "any and all personal items, personal belongings, and personal property." The Final Decree then awards each party "the personal property in his or her care."

{¶ 71} The trial court did not make any findings as to separate or marital property, and it is unclear from this record which and how many items were in dispute and whether Freda in fact received her portion of the uncontested

property. Having thoroughly reviewed the record and considering that Freda was allowed to leave the marital residence with only her personal belongings, we conclude that the trial court abused its discretion in its arbitrary division of personal property, the effect of which appears to award Timothy all the parties' property within the marital home. Although reluctant to engage in a piecemeal review of the individual aspects of a property division, the trial court's arbitrary disregard of the evidence of partial agreement mandates further consideration by the trial court, particularly in light of the trial court's decision awarding all household furnishings to Timothy.

{¶ 72} Freda's first assignment of error is sustained as to the trial court's award of "personal property," and the matter is reversed and remanded with instructions to the trial court to "determine what constitutes marital property and what constitutes separate property [and] * * * upon making such a determination, * * * divide the marital and separate property equitably between the spouses." R.C. 3105.171(B).

{¶ 73} Freda's second assignment of error is as follows:

{¶ 74} "A decision denying spousal support without setting forth an appropriate and reasonable standard may not be sustained."

{¶ 75} Freda argues, regarding the court's decision denying her spousal support, that "[t]here appears to be no basis for this Court's Decision, since the marital residence and all household furnishings and other marital household property were all awarded to the Appellee. The largest portion of the parties['] pensions [was] also awarded to the Appellee and the Appellant, who has less than one half of the Appellee's income, was [o]rdered to pay seventy three percent of the parties['] debt." Freda further argues that the parties had reached an agreement regarding spousal support and that the trial court abused its discretion in failing to adopt it. Finally, Freda argues that the trial court failed to take her health and medical expenses into account when it denied her request for spousal support.

{¶ 76} Timothy argues in response that Freda misstates his income, that the majority of the credit card debt was Freda's alone, that the parties' retirement benefits were equitably divided, and that the parties did not reach an agreement regarding spousal support. According to Timothy, "[t]he testimony was unrefuted that during the pendency of this action, Appellee was paying all of the household bills, except for phone/internet service * * * due to Appellant's refusal to pay any of the other household bills * * *. Thus, it is reasonable for the Trial Court to conclude that Appellant had, in essence, received temporary spousal support from the time of the filing of the Complaint, October [5,] 2006, until, at a

minimum, 14 days from the October 26, 2007 entry granting [Appellee] the marital residence."

{¶ 77} "Domestic relations courts are granted broad discretion concerning awards of spousal support, and their orders will not be disturbed on appeal absent an abuse of discretion. * * * When applying the abuse of discretion standard of review, we must not substitute our judgment for that of the trial court." *Perry v. Perry,* Clark App. No. 07–CA–11, 2008-Ohio-1315, 2008 WL 748370, ¶ 5.

{¶ 78} R.C. 3105.18(C)(1) provides, "In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

{¶ 79} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

{¶ 80} "(b) The relative earning abilities of the parties;

{¶ 81} "(c) The ages and the physical, mental, and emotional conditions of the parties;

{¶ 82} "(d) The retirement benefits of the parties;

{¶ 83} "(e) The duration of the marriage;

{¶ 84} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

{¶ 85} "(g) The standard of living of the parties established during the marriage;

{¶ 86} "(h) The relative extent of the education of the parties;

{¶ 87} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

{¶ 88} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

{¶ 89} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

{¶ 90} "(l) The tax consequences, for each party, of an award of spousal support;

{¶ 91} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

{¶ 92} "(n) Any other factor that the court expressly finds to be relevant and equitable."

{¶ 93} We will not address Freda's arguments herein regarding the distribution of the parties' marital residence and the personal property therein, having done so under Freda's first assignment of error. Regarding Freda's remaining arguments addressed to the parties' incomes, their retirement benefits, their credit card debt, an alleged agreement between the parties as to spousal support and Freda's health, we will briefly summarize the evidence before the trial court:

{¶ 94} The record reveals that Timothy is employed at Weston Solutions, where his gross income is $53,600. The record further reveals that Timothy receives $15,800 in retirement income, an amount that accounts for a deduction from Timothy's gross retirement income for Timothy's first spouse. Timothy's total yearly income is accordingly $69,400, and not $78,572, as Freda asserts. Freda is employed at the commissary at Wright Patterson Air Force Base, where she makes $15.63 an hour, plus two or three hours of overtime usually every pay period, at time and a half. Freda has been employed at the Base for 16 years and worked throughout the parties' marriage.

{¶ 95} Regarding division of retirement benefits, the trial court determined the marital portion of the parties' retirements by a coverture fraction. The numerator of the coverture fraction is a party's years of service under the plan that were earned during the marriage, and the denominator is the party's total number of years of service under the plan. Timothy earned retirement benefits for 24 years of service in the United States Air Force, and the parties were married for three of Timothy's 24 years in service. The trial court awarded Freda one half of the coverture fraction, which is three over 24. The decree also provides that Timothy had a retirement account from Weston Securities worth $10,096.47, and Freda was awarded half of the account's value, a fact absent from discussion in Freda's brief. Finally, Freda funded a retirement account at Wright Patterson Air Force Base for 16 years, and she was married to Timothy for nine of those years. Timothy was awarded one half of the coverture fraction, which is nine over 16.

{¶ 96} Freda also argues that she is entitled to spousal support because the trial court ordered Timothy to assume 27 percent of the parties' credit card debt, while she was required to assume 73 percent of that debt. Timothy testified that he has "one [Cabela's Club] credit card that has been [his] and solely [his] and * * * [Freda] has numerous credit card accounts that [he's] never had access to or a card or used or anything." Timothy added, "[W]hen I saw the number of credit cards that were coming in and balances that were ran up, I approached [Freda] about the matter and asked her how could she have balances in tens of

thousands of dollars when there is nothing to show for it. And she * * * just held out her hands and shrugged her shoulders * * *."

{¶ 97} Freda confirmed that she has multiple cards in her name alone that Timothy did not use, and she initially stated, "I wouldn't know which one I spent joint and which one I didn't." Freda then testified that her Mastercard, Capital One Visa card, and Washington Mutual credit cards were used for marital purposes. Freda indicated she was unsure of the nature of the purchases on her Discover card. According to Freda, she did not use her Lowe's credit card for marital expenses, and her CitiFinancial credit card balance represented expenses for property she owned in Kentucky.

{¶ 98} As Timothy asserts, the record reveals that Freda, from the time Timothy filed his complaint until she vacated the marital residence, paid only for the parties' phone and Internet service ($70 a month), while Timothy made the monthly mortgage and utility payments. When asked whether she contributed money to her and Timothy's joint checking account from her income, Freda testified that she had contributed money to the account, stating, "I didn't have all the debit/credit cards at the time, so I didn't mind helping out." Freda testified on direct examination that after paying for the phone and Internet services, she applied her remaining monthly income to her credit card debt and that she always paid more than the minimum amount due on the cards. Her testimony on cross-examination, however, suggests that she spent her money on things other than her debt, such as cigarettes, and that her credit card balances remained high and were subject to late fees.

{¶ 99} The trial court allocated Timothy's Cabela's Club Visa debt to him in its entirety. The balance due was $3,829.88. The trial court allocated half of Freda's Washington Mutual credit card debt ($1,554.91) and half of Freda's Capitol One Visa debt ($114.31) to Timothy as well, determining that the balances on those credit cards represented "joint debt." The total debt allocated to Timothy is $5,499.10.

{¶ 100} In addition to half of the joint debt, the trial court allocated the full balances of Freda's Bank of America Visa ($3,764.86), MBNA ($4,780), Lowe's credit card ($305.14), Discover Card ($2,000), and CitiFinancial credit card ($485.25) to Freda, and her total allocation of credit card debt is $13,004.47.

{¶ 101} Finally, Freda argues that she is entitled to spousal support because the parties had reached an agreement regarding spousal support. The following exchange suggests that Freda and Timothy at least entered into negotiations regarding spousal support before their final hearing:

{¶ 102} "MR. COATES: * * * I guess before we go forward, I just want to make sure, is there any dispute on the spousal support calculation? I know Judge Hurley had done that for us before several—

{¶ 103} "THE COURT: We didn't get that far.

{¶ 104} "MR. COATES: No, we didn't get that far. Before I start asking questions here I want some sort of—I'm kind of going down my list, it was $607.46 per month for a three year period is what I had in my notes.

{¶ 105} "THE COURT: Do we have temporary spousal support?

{¶ 106} "MR. COATES: No, we did not because they have lived together this entire time.

{¶ 107} "THE COURT: It would be 36 months from the time of—

{¶ 108} "MR. COATES: It would be 36 months from the time of the decree, yes, subject to the usual conditions of termination, I guess; possibility of remarriage, whatever.

{¶ 109} "MR. BARBATO: Put down an agreement.

{¶ 110} "MR. COATES: Did you work it?

{¶ 111} "MR. BARBATO: No.

{¶ 112} "THE COURT: I need income information." [1]

{¶ 113} Finally, regarding her health, Freda testified that she has an inoperable brain cyst and ulcers. She also indicated that she is able to continue working. Freda provided the court with no evidence of her medical expenses, a fact she admits in her brief. We note that the decree provides that Freda "may elect to continue using the Plaintiff's health insurance by applying for COBRA benefits at her own cost. The Plaintiff is ordered to cooperate with the Defendant to obtain the COBRA benefits if she chooses to use them."

{¶ 114} Having concluded our thorough review of the record, and given our decision reversing the division of marital property above, we now must vacate the trial court's denial of spousal support. See *Kunkle v. Kunkle* (1990), 51 Ohio St.3d 64, 67, 554 N.E.2d 83 ("As part of a divorce proceeding, a trial court has equitable authority to divide and distribute the marital estate, *and then* consider whether an award of sustenance alimony would be appropriate. [Emphasis added.] *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 541 N.E.2d 597; R.C. 3105.18(A).") In other words, the trial court must properly classify and divide the parties' property and *thereafter* consider Freda's request for spousal support.

---

1. Although the court suggests income information was needed to calculate spousal support, this information was available, and the parties do not dispute there were discussions regarding as much as $607.46 per month for 36 months.

Accordingly, Freda's second assignment of error is sustained, and the trial court's decision denying her request for spousal support is hereby vacated.

{¶ 115} Finally, while Freda argued that the trial court's decision denying spousal support lacked a rationale, it is clear that evidence was adduced that was relevant to multiple R.C. 3105.18(C)(1) factors, and we "indulge the presumption that the trial court considered all the relevant statutory factors." *Murphy v. Murphy* (Nov. 1, 1996), Montgomery App. No. 15693, 1996 WL 629522. We note, however, that Freda is entitled, pursuant to Civ.R. 52, to request findings by the trial court regarding its spousal-support decision upon remand. Civ.R. 52, made applicable to divorce actions pursuant to Civ.R. 75(A), provides, "When questions of fact are tried by the court without a jury, judgment may be general for the prevailing party unless one of the parties in writing requests otherwise before the entry of judgment pursuant to Civ.R. 58, or not later than seven days after the party filing the request has been given notice of the court's announcement of its decision, whichever is later, in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law."

{¶ 116} Both assignments of error having been sustained, the judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this decision.

Judgment reversed
and cause remanded.

GRADY and WOLFF, JJ., concur.

WILLIAM H. WOLFF JR., J., retired, of the Second District Court of Appeals, sitting by assignment.