[Cite as *Archer v. Dunton*, 2019-Ohio-1971.]

STATE OF OHIO      )          IN THE COURT OF APPEALS
                 )ss:      NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT     )

DEBORAH JANE ARCHER            C.A. No.      29091

    Appellant

    v.                            APPEAL FROM JUDGMENT
                                   ENTERED IN THE
STEVEN DUNTON                 COURT OF COMMON PLEAS
                                   COUNTY OF SUMMIT, OHIO
    Appellee                 CASE No.     DR-1992-09-2167

DECISION AND JOURNAL ENTRY

Dated: May 22, 2019

CALLAHAN, Judge.

{¶1} Appellant, Deborah Archer, appeals an order of the Summit County Court of Common Pleas, Domestic Relations Division. This Court reverses.

I.

{¶2} Deborah Archer and Steven Dunton divorced in 1993 after eighteen years of marriage. Their divorce decree, which incorporated a separation agreement, provided that Ms. Archer was entitled to one-half of Mr. Dunton's pension through the Ohio Police and Fire Pension Fund as of the date of divorce. It further provided that "[s]hould Ohio law be amended so as to allow a Qualified Domestic Relations Order, or similar Order, on state-administered pension plans, then said Order shall be filed on Husband's pension plan." The decree required thirty days' notice to Ms. Archer if Mr. Dunton elected to receive a lump sum instead of periodic pension payments and determined both the present value of the pension and Ms. Archer's one-half share as of the date of divorce for that purpose.

{¶3}    In 2003, the trial court issued a Division of Property Order ("DOPO") that set forth the amount payable to Ms. Archer as alternate payee from Mr. Dunton's monthly pension benefit or, in the alternative, the amount that would be distributed to her if Mr. Dunton elected a lump-sum distribution upon retirement.  Mr. Dunton, however, elected to participate in a Deferred Retirement Option Plan ("DROP") instead of receiving his pension benefits.[1]  As a result of his decision, the monthly pension payments to which he would otherwise have been entitled, derived from his pension contributions, were deposited into an interest-bearing account instead of being paid to him, and he continued to work, with his future individual and employer pension contributions deposited into the DROP account as well.

{¶4}    In 2016, Mr. Dunton moved to set aside that DOPO under Civ.R. 60(B)(5).  Ms. Archer moved to modify the DOPO to reflect Mr. Dunton's participation in DROP.  The trial court granted Mr. Dunton's motion for relief from judgment, but did not address Ms. Archer's motion to modify.  Ms. Archer appealed, and this Court determined that the trial court erred by granting the motion for relief from judgment because Mr. Dunton had based his motion on alleged mistakes by the trial court that cannot support relief under Civ.R. 60(B).  *Archer v. Dunton*, 9th Dist. Summit No. 28519, 2017-Ohio-8846, ¶ 11.  This Court also noted that the trial court had not yet considered Ms. Archer's motion to modify the DOPO, which remained pending.  *Id*. at ¶ 18.

{¶5}    On remand, the parties filed briefs addressing the scope of the trial court proceedings on remand—a matter over which there was considerable dispute.  Although his motion for relief from judgment had been fully addressed by this Court, Mr. Dunton did not file

---

[1] Neither DOPOs nor DROPs were available under Ohio law at the time of the parties' divorce.

a motion to modify the DOPO or seek further relief upon remand. On June 19, 2018, the trial court issued an order concluding that the funds in Mr. Dunton's DROP account were not marital property and denying Ms. Archer's motion to modify the DOPO on that basis. The trial court also sua sponte determined that the DOPO was not consistent with the divorce decree and permitted Mr. Dunton to submit an amended DOPO. Ms. Archer appealed, and her two assignments of error are rearranged for purposes of discussion.

II.

## ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED BY DENYING MS. ARCHER'S MOTION TO MODIFY THE DIVISION OF PROPERTY ORDER.

**{¶6}** Ms. Archer's second assignment of error argues that the trial court erred by denying her motion to modify the 2003 DOPO to include the growth in her share of the marital portion of Mr. Dunton's pension during his participation in DROP. This Court agrees.

**{¶7}** In divorce cases, a trial court must designate marital and separate property and divide the property equitably between spouses. R.C. 3105.171(B). "Marital property" includes retirement benefits acquired by either spouse during the marriage. R.C. 3105.171(A)(3)(a)(i). *See also Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178-179 (1990). A qualified domestic relations order ("QDRO") "implements a trial court's decision of how a pension is to be divided incident to divorce or dissolution" by assigning to an alternate payee-spouse the right to receive benefits payable to a private sector plan participant in conformance with federal law. *Wilson v. Wilson*, 116 Ohio St.3d 268, 2007-Ohio-6056, ¶ 6-7. Public sector pension plans, similarly, are subject to division by a DOPO authorized by R.C. 3105.81 et seq. *See also* Ohio Adm. Code Chapter 742-21. Without an express reservation of jurisdiction or consent of the parties, a trial court cannot enter a DOPO that is inconsistent with the division of property set forth in the decree.

*Cameron v. Cameron*, 10th Dist. Franklin No. 12AP-349, 2012-Ohio-6258, ¶ 13. "A DOPO is inconsistent with a decree when it modifies the division of retirement benefits ordered in the decree, and a DOPO modifies a division of retirement benefits when the DOPO varies from, enlarges, or diminishes the awards the court ordered in the decree." *Id.* citing *Knapp v. Knapp*, 4th Dist. Lawrence No. 05CA2, 2005–Ohio–7105, ¶ 40.

{¶8}   Ms. Archer's motion to modify the 2003 DOPO argued that she was entitled to receive a percentage of Mr. Dunton's DROP account "because[] the post-divorce DROP is funded, in part, by marital property in the form of Ohio Police and Fire Pension Fund benefits [Mr. Dunton] earned during the course of his marriage." In other words, Ms. Archer's position is that because Mr. Dunton's pension is a marital asset to the extent that it was earned during the parties' marriage, the growth in her share of the marital portion of the pension as a result of its investment in Mr. Dunton's DROP account is marital as well, and failure to include the DROP account diminished the award ordered in the decree. This Court agrees.

{¶9}   Three methods are generally used to divide the marital portion of a pension. *See generally Hoyt* at 178-179. At one extreme, courts may determine the present cash value of the nonparticipating spouse's share and award the nonparticipating spouse that amount at the time of the divorce by allocating other marital assets or structuring a cash payout. *Id.* at 182. Under this method, also called the "frozen" method, the nonparticipating spouse does not share in the growth of the retirement account as a whole or in the growth in her share over time as a result of investment because the parties' economic relationship has been fully severed as of the time of the divorce. *See Forman v. Forman*, 3d Dist. Marion No. 9-06-63, 2007-Ohio-4938, ¶ 7.

{¶10}  At the other extreme, courts may reserve jurisdiction and determine the parties' proportionate shares at the time of retirement using the traditional coverture fraction, which is

the ratio of the years employed by the participating spouse during the marriage to the total years of employment. *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, ¶ 33 (10th Dist.), citing *Smith v. Smith*, 182 Ohio App.3d 375, 2009-Ohio-2326, ¶ 95 (2d Dist.) and *Hasselback v. Hasselback*, 10th Dist. Franklin No. 06AP–776, 2007-Ohio-762, ¶ 11. This methodology allows the nonparticipating spouse's share to increase in value not merely as a result of investment, but as a result of the other spouse's continued participation in the retirement plan until maturity. *Thompson* at ¶ 34, 39-40. "Consequently, 'with each passing year after the divorce, the [nonmember spouse] is earning a smaller percentage of a larger pie.'" (Alterations in original.) *Id.* at ¶ 34, quoting 2 Sowald & Morganstern, *Domestic Relations Law*, Section 30:29, at 657 (4th Ed.Rev.2009).

**{¶11}** The frozen coverture method is a hybrid of the two. *See Forman* at ¶ 7. This method of calculation "requires the court to determine the value of the pension account as if it were frozen on the divorce date." *Cook v. Cook*, 9th Dist. Summit No. 28575, 2017-Ohio-8848, ¶ 16, citing *Cameron*, 2012-Ohio-6258, at ¶ 17. When a court uses the frozen coverture method, it calculates the present value of the retirement account at the time of the divorce based upon the then-existing base compensation and years of service. *Cook* at ¶ 16. The nonparticipating spouse ultimately receives smaller payments using this calculation because the nonparticipating spouse does not share in postdivorce increases that accrue to the pension as a result of increases in salary or years of service. *See Harrington v. Ford*, 10th Dist. Franklin No. 14AP-954, 2015-Ohio-3571, ¶ 21 ("[U]nder the frozen coverture method, the value of the future monthly benefit is frozen because it does not gain value from years served after the divorce or increases in salaries after the divorce."). Absent language in a divorce decree that provides for a present value cash distribution at the time of the divorce or a deferred distribution, the frozen coverture

method "does not * * * involve a limit or cap on those payments in the amount of the frozen or hypothetical value." *Cook* at ¶ 17. In other words, it does not cap the nonparticipating spouse's benefits at a sum certain. *Id.* The nonparticipating spouse shares in the growth over time due to investment of her share of the portion of the retirement fund that represents a marital asset.

**{¶12}** The starting point for this Court's analysis is the parties' 1993 divorce decree, which addressed Mr. Dunton's pension as follows:

> 11.0 The parties agree that the Wife is entitled to one-half of the Husband's pension through the Police and Fire Pension Fund for the State of Ohio as of the date of the divorce. Should Ohio law be amended so as to allow a Qualified Domestic Relations Order, or similar Order, on state-administered pension plans, then said Order shall be filed on Husband's pension plan.

> 11.1 Wife shall be notified within thirty (30) days should Husband elect to obtain from his pension plan a cash distribution in lieu of pension benefits. The parties recognize that the present value of the pension plan is $58,618.27, and that Wife's current one-half (1/2) interest in said pension is $29,309.14.

> 11.2 The jurisdiction of the Summit County Court of Common Pleas, Domestic Relations Division, shall be preserved concerning all issues involving division of Husband's pension.

The reference to the "present value" of the pension plan and Ms. Archer's proportionate share was not coupled with a corresponding allocation of other marital property or with a cash distribution, so it did not fix Ms. Archer's pecuniary interest in the pension at an amount certain and sever the parties' economic interests. Instead, by specifying that Ms. Archer was entitled to one-half of Mr. Dunton's pension "as of the date of the divorce," the decree contemplated that payments to Ms. Archer from Mr. Dunton's pension would be calculated upon maturity using the frozen coverture method. Accordingly, Ms. Archer's share of the marital portion of the pension remained part of the retirement account after the divorce. Because the coverture fraction had been determined as of the date of divorce, she did not share in growth due to Mr. Dunton's increasing salary or years of service, but her share of the marital portion did experience

investment growth over time. Mr. Dunton's participation in DROP is one form of investment growth that took place before he retired. When a member of the Police and Fire Pension Fund elects to participate in DROP, the member ceases to accrue additional service credit, but forgoes receipt of the monthly pension benefit that would otherwise be payable to the member upon retirement. *See* R.C. 742.441. While the member continues to work, those monthly pension payments—including amounts that might otherwise be paid to an alternate payee—are deposited into a DROP account. *See* R.C. 742.443(A). The payroll contributions that are withdrawn from the member's current compensation are also deposited into the account, beginning with fifty percent during the first three years of participation, seventy-five percent in years four through six, and finally, one hundred percent in years seven and eight, should the member elect to participate in DROP for the full timeframe permitted. Ohio Adm.Code 742-4-07(A). The deposited funds earn interest quarterly at a variable rate not to exceed five percent. Ohio Adm.Code 742-4-09(A). When the member's active employment ends, the member is entitled to a lump-sum payment of the balance in the DROP account or to periodic distributions as permitted by the retirement plan. R.C. 742.444(B)(3). *See also* Ohio Police & Fire Pension Fund, *Members Guide to: Deferred Retirement Option Plan (DROP)*, https://www.op-f.org/(S(lvpnet41ln5x0xtumffefvv0))/Files/MGdrop.pdf (accessed May 16, 2019).

{¶13} Because a DROP account is funded, in part, by the total pension payment that would otherwise be due to the member, a postdivorce DROP may be continually funded by both marital property, in the form of benefits earned during the course of the marriage, and nonmarital property, in the form of benefits earned before and after the marriage as well as current contributions. *See Meeker v. Skeels*, 6th Dist. Lucas No. L-09-1190, 2010-Ohio-3525, ¶ 15. Marital assets retain their character:

> "The monthly retirement benefits to be accumulated in the [member's] DROP account are the benefits that had already accrued during his employment with the state before the filing of the divorce action, and they are not different in character from retirement benefits paid directly to a retired employee. An employee merely continues to earn his or her regular salary while his or her retirement benefits accumulate in a DROP account. Accordingly, at the conclusion of the required term of service, the [member] will receive, on a deferred basis, the retirement benefits that he earned during the course of his marriage, and that he could have begun receiving * * * but for his election to participate in DROP."

(Omission in original.) *Id*. at ¶ 17, quoting *Killingsworth v. Killingsworth*, 925 So.2d 977, 982 (Ala.App.2005). In other words, "[t]he character of those [retirement plan] benefits as marital property does not change simply because they are deposited into a DROP account rather than paid directly to [the member]." *Meeker* at ¶ 15. In a case in which the traditional coverture fraction is applied, growth in the pension as a result of DROP investment before the coverture fraction is applied to the marital share will be one factor that increases the size of the pie from which the nonparticipating spouse's benefit is determined. *Compare Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, at ¶ 33. *See*, *e.g.*, *Meeker* at ¶ 21. Although that is not the situation when the frozen coverture methodology has been applied at the time of the divorce, the investment of the martial portion of retirement benefits in a DROP account still impacts the nonparticipating spouse's interest.

{¶14} The divorce decree in this case awarded one-half of Mr. Dunton's pension on the date of the divorce to Ms. Archer. Had Mr. Dunton retired without participating in DROP, Ms. Archer would have been entitled to receive monthly payments or a lump sum in an amount determined with reference to the marital portion of Mr. Dunton's pension at the time of his retirement. Although *Meeker* involved application of the traditional coverture method, that Court's conclusions regarding the nature of Mr. Dunton's contributions to DROP are applicable in this case as well: the marital portion of his pension did not change in character upon his

participation in DROP. Consequently, Ms. Archer is entitled to that portion of the DROP account that is attributable to her share of Mr. Dunton's benefits earned during the course of the marriage, consistent with the divorce decree. *See id.* at ¶ 21. Of course, the method of calculating the amount that Ms. Archer is entitled to receive will not be based on the traditional coverture method, as in *Meeker. See id.*

{¶15} The trial court, therefore, erred by concluding that Ms. Archer was not entitled to any portion of Mr. Dunton's DROP distributions, and her second assignment of error is sustained.

## ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED BY MODIFYING THE DOPO TO, IN EFFECT, OVERRULE THIS HONORABLE COURT'S DENIAL OF MR. DUNTON'S 60(B) MOTION FOR RELIEF FROM JUDGMENT.

{¶16} In her first assignment of error, Ms. Archer argues that the trial court erred by permitting Mr. Dunton to submit a modified DOPO on the same grounds articulated in his motion for relief from judgment. This Court agrees in part.

{¶17} The doctrine of the law of the case limits the ability of a trial court to rule in a way that is inconsistent with a decision of a reviewing court in the same case, and "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." (Citations omitted.) *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). The doctrine also "limits the actions that a trial court may take on remand to the scope of the reviewing court's mandate and places a corresponding limitation on the ability of an appellant to assert error in subsequent appeals." *Allen v. Bennett*, 9th Dist. Summit No. 24124, 2008-Ohio-4554, ¶ 9, citing *Neiswinter v. Nationwide Mut. Fire Ins. Co.*, 9th Dist. Summit No. 23648, 2008–Ohio–37, ¶ 10.

**{¶18}** Although this Court's previous decision did not rule on the merits of Mr. Dunton's arguments in a manner that would have precluded him from seeking further relief through a motion to modify the 2003 DOPO, we did conclude that relief under the motion that he had *already* filed was not warranted because it failed to allege permissible grounds for relief under Civ.R. 60(B)(5). *Archer*, 2017-Ohio-8846, at ¶ 11. As a result, there were no outstanding issues in that motion for determination upon remand.

**{¶19}** Because Mr. Dunton's motion had been fully resolved, the only motion pending in the trial court upon remand was Ms. Archer's motion to modify the DOPO. *See Archer* at ¶ 18. Mr. Dunton, however, did not avail himself of the opportunity to seek relief through a motion to modify the DOPO upon remand. The parties did file simultaneous briefs addressing the scope of the issues before the trial court on remand, but Mr. Dunton did not request relief by means of a written motion, as required by Civ.R. 7(B)(1). Although that rule permits motions to be made orally "during a hearing or a trial," there is no indication in the appellate record that such a motion was made in this case. *Id.*

**{¶20}** Because this Court had previously determined that Mr. Dunton could not establish that he was entitled to relief under Civ.R. 60(B), the trial court erred in effectively revisiting his motion for relief from judgment upon remand. Ms. Archer's first assignment of error is sustained solely on that basis.

### III.

**{¶21}** Ms. Archer's first and second assignments of error are sustained. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division, is reversed. This matter is remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

LYNNE S. CALLAHAN
FOR THE COURT

TEODOSIO, P. J.
CONCURS.

CARR, J.
DISSENTING.

{¶22} I respectfully dissent from the judgment of the majority as I would overrule both of Ms. Archer's assignments of error.

{¶23} With respect to Ms. Archer's first assignment of error, I would conclude that the trial court could have reasonably viewed Mr. Dunton's arguments as a motion to modify the DOPO. In the prior appeal, this Court noted that its resolution of Ms. Archer's first assignment of error, "put[] the entire matter back before the trial court[.]" *Archer v. Dunton,* 9th Dist. Summit No. 28519, 2017-Ohio-8846, ¶ 18. Subsequent to the remand, from the parties' filings, it is clear that both sides believed there were problems with the DOPO, albeit for different reasons. In addition, the decree is clear that the trial court retained jurisdiction to address issues involving the division of Mr. Dunton's pension. Giving the foregoing, I cannot say that the trial court erred in determining it was appropriate to modify the DOPO.

{¶24} As to Ms. Archer's second assignment of error, I would conclude that Ms. Archer's motion to modify the DOPO to include funds from Mr. Archer's participation in DROP was properly overruled by the trial court. There is no dispute that the divorce decree employs a frozen coverture method of calculation, as opposed to a traditional coverture method. "Under the frozen coverture method * * * the trial court 'freezes' the pension benefits at the amount in the account as of the divorce date. Sometimes called the 'hypothetical' approach, it calculates the value of the participant spouse's retirement account had he or she retired on the same day the parties divorced, using the then-present base pay and years of service." *Cameron v. Cameron*, 10th Dist. Franklin No. 12AP-349, 2012-Ohio-6258, ¶ 17. Notably, "[u]nder this approach, the non-participant spouse receives no interest the account accrues after that date." *Id.* Thus, "[t]he relevant difference between the two methods, for present purposes, is their treatment of interest the pension fund earns after the divorce date. The * * * frozen coverture[] method * * * awards all post-divorce interest to the participant spouse. The * * * traditional coverture[] method allows the non-participant spouse to share in the benefit of any post-divorce increase in the value

of his or her unmatured proportionate share attributable to the participant's continued participation in the retirement fund." *Id.* at ¶ 19.

{¶25} Accordingly, Ms. Archer's award was determined at the time of the divorce. Mr. Dunton did not enter the DROP program until 2006, long after the parties divorced. Ms. Archer cannot demonstrate an entitlement to the DROP funds as the amount of her benefit was determined at the time of the divorce and, because of that, the award does not include interest earned subsequent to the divorce. *See id.* Ms. Archer is entitled only to that portion of marital assets that was awarded to her. *See Meeker v. Skeels*, 6th Dist. Lucas No. L-09-1190, 2010-Ohio-3525, ¶ 21. Thus, the fact that the DROP account may contain marital assets is not determinative of whether Ms. Archer is entitled to any of those funds. This case is unlike *Meeker* as *Meeker* involved an award under the traditional coverture method. *See id.* at ¶ 2; *see also Cameron* at ¶ 38. As the traditional coverture method involves allocating the non-participant spouse post-divorce interest, "changes in benefit accrual that took place subsequent to the divorce could impact that spouse's total benefits." *Cameron* at ¶ 38. Therefore, it makes sense that, in those circumstances, "the non-participant spouse [is] entitled to a percentage of the future DROP benefits to the extent they derived from retirement benefits earned during the course of the marriage." *Id.* The same cannot be said here where a frozen coverture method was employed; Mr. Dunton's participation in DROP did not change the amount that Ms. Archer was entitled to under the decree. *See id.* at ¶ 37-38. Accordingly, Ms. Archer's motion was properly denied.

APPEARANCES:

JANE TIMONERE, Attorney at Law, for Appellant.

J. ANTHONY TERILLA, Attorney at Law, for Appellee.