THOMPSON, Appellant,

v.

THOMPSON, Appellee.

[Cite as *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 11AP–212.

Decided Dec. 8, 2011.

David C. Watson and Titus G. Donnell, for appellant.

Law Offices of William L. Geary Co., L.P.A., Tracy Q. Wendt, and William L. Geary, for appellee.

KLATT, Judge.

{¶ 1} Plaintiff-appellant, Grace M. Thompson, appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, that granted her and defendant-appellee, Nathaniel B. Thompson, a divorce. For the following reasons, we affirm.

{¶ 2} The parties married on October 16, 1970. They have one son, who is now emancipated. During the marriage, Grace taught in the Worthington City School District. Nathaniel worked in automobile sales and dealership management, and later in software installation and training.

{¶ 3} Grace filed a complaint for divorce on June 5, 2007. Nathaniel answered and filed a counterclaim for divorce. Prior to trial, the trial court determined that the de facto termination date of the parties' marriage was June 30, 2003. To facilitate the division of their property, the parties stipulated to the values of most of their assets.

{¶ 4} The primary issue at trial was the appropriate division of the parties' retirement benefits. As a public school teacher, Grace was a member of the State Teachers Retirement System ("STRS") entitled to pension benefits under a

defined benefit plan. Upon retirement, Nathaniel anticipated receiving Social Security benefits and income from a "PPA" retirement plan and a 401(k) account.

{¶ 5} When the trial occurred in May 2009, neither spouse had yet retired. Grace testified that she was 60 years old and that she planned to teach for two more school years before retiring. Nathaniel, who was 62 years old, offered no testimony regarding when he intended to retire.

{¶ 6} Both parties presented expert witnesses to opine on the appropriate division of the retirement benefits. Grace's expert witness, J. Michael Nesser, testified that if Grace retired at age 66, she would receive a monthly benefit of $3,114 based on the years of service completed as of June 30, 2003, i.e., the de facto marriage-termination date. Nesser testified that if Nathaniel retired at age 66, he would receive a monthly Social Security benefit of $2,282 based on his earnings through 2003. Nesser also calculated the monthly revenue stream that Nathaniel could expect to receive from his "PPA" retirement plan and 401(k) account if he retired at age 66. Nesser then compared the retirement incomes that each party would receive, and he concluded that they "roughly approximate[d]" each other.

{¶ 7} Unlike Nesser, Nathaniel's expert witness, William Napoli Jr., did not freeze the amount of Grace's retirement benefit on June 30, 2003. Rather, Napoli estimated the amount of Grace's benefit if she retired at age 59, 60, 61, 62, 63, 64, and 65 based on *all* the years of her foregoing service—including those years that Grace taught after the termination of the parties' marriage. To do this, Napoli first determined the amount that Grace had earned each year. Napoli knew only the amount of Grace's annual salary through the 2005–2006 school year. Consequently, Napoli assumed that her salary had increased and would increase 3.15 percent for each school year thereafter.

{¶ 8} Napoli then determined the percentage of retirement benefit that accrued as Grace accumulated years of service. Pursuant to the terms governing the STRS defined benefit plan, Grace received a 2.2 percent benefit for each year she taught through her first 30 years of service. See R.C. 3307.58(B)(2)(a)(i). After year 30, the yearly benefit percentage increased, so that in year 31, Grace received a 2.5 percent benefit; in year 32, she received a 2.6 percent benefit; in year 33, she received a 2.7 percent benefit; in year 34, she would receive a 2.8 percent benefit; and in year 35, she would receive a 2.9 percent benefit. See R.C. 3307.58(B)(2)(a)(ii). Once Grace completed her 35th year, the pension-plan terms called for STRS to increase the yearly benefit for years 1 through 30 from 2.2 to 2.5 percent. See R.C. 3307.58(B)(2)(a)(i). In other words, if Grace taught for 35 years, she was entitled to a cumulative "bump" of 11.9 percent in the benefit percentage (i.e., 2.9 percent for year 35 plus 0.3 percent for the first 30 years equals 11.9 percent).

{¶ 9} After assigning the appropriate benefit percentage to each year, Napoli multiplied each year's percentage by Grace's final average salary. See R.C. 3307.58(B)(2)(a). Napoli arrived at the final average salary by adding together Grace's three highest years of compensation and dividing that sum by three. See R.C. 3307.501(C). Finally, Napoli divided by 12 the total he had reached by multiplying the year's benefit percentage by the final average salary. The result was Grace's monthly accrued benefit if she decided to retire in the particular year. Using this statutory formula, Napoli projected the amount of Grace's monthly accrued benefit for each year she could retire from year 32 (when she was 59 years old) to year 38 (when she would be 65 years old).

{¶ 10} Next, based on the amount of the monthly accrued benefit, Napoli computed the present value of the accrued benefit for each year Grace could retire from year 32 to year 38.[1] Napoli then multiplied those figures by the applicable coverture fraction. The numerator of the coverture fraction is the number of years of employment during the marriage, and the denominator is the total number of years of employment. Here, the numerator remained static at 27 years, but the denominator increased as Grace continued to teach after the de facto termination date. By applying the applicable coverture fraction to the present value of each year's accrued benefit, Napoli determined the portion of the present value that constituted marital property.

{¶ 11} Although an equal division of marital property would normally entitle Nathaniel to half of that amount, Napoli needed to factor in Social Security benefits that Nathaniel earned during the parties' marriage. To accomplish this, Napoli determined the present value of Nathaniel's yearly Social Security benefit if he worked until age 66.[2] Napoli then divided the present value by half to get the marital portion of Nathaniel's Social Security benefit. Napoli subtracted that amount from the marital portion of the present value of each year's STRS accrued benefit. The resulting sum was the net marital retirement benefit.

{¶ 12} Next, Napoli divided the net marital retirement benefit by a single life annuity factor for Nathaniel and then divided the result by half. Napoli thus arrived at the amount that Nathaniel was entitled as a monthly benefit to compensate him for his half of the net marital retirement benefit. Napoli then determined and applied to Nathaniel's monthly benefit the factor by which STRS would reduce Grace's monthly accrued benefits if, upon retirement, she opted to

---

1. Napoli determined the present value of each year's accrued benefit by (1) estimating the number of payments Grace could expect to receive during her lifetime based upon mortality rates and (2) using the interest rate on corporate bonds with a Moody grade of Aa to discount each future payment to the date of evaluation.

2. Napoli excluded from this value the benefit attributable to work that Nathaniel performed prior to the marriage.

receive her benefits in the form of a joint and survivor annuity naming Nathaniel the beneficiary. This lessening of Nathaniel's interest in the net marital retirement benefit ensured that Nathaniel alone bore the cost of the election of a survivorship benefit.

{¶ 13} Having accounted for Nathaniel's Social Security benefits and the election of a survivorship benefit, Napoli next calculated the percentage of Grace's monthly accrued benefit that Nathaniel should receive for each year from year 32 to year 38. After averaging those percentages, Napoli recommended that the trial court assign to Nathaniel 42 percent of Grace's monthly accrued benefit in the division of property order ("DOPO").[3] Thus, under the terms of the proposed DOPO, STRS would pay Nathaniel 42 percent of each monthly accrued benefit after application of the appropriate coverture fraction.

{¶ 14} Nesser criticized Napoli's use of the coverture fracture to divide Grace's accrued retirement benefit into marital and separate portions. The coverture fraction weighs each year of employment equally. The terms of the STRS defined benefit plan, however, weigh years 31 through 35 of a teacher's career more heavily than the first 30 years. Thus, Nesser pointed out, Grace would earn a significant portion of her retirement benefit between the 2006–2011 school years. Because the parties' marriage ended on June 30, 2003, Nesser asserted that it was unfair to award Nathaniel any part of the benefit that accrued after that date.

{¶ 15} Nesser suggested two alternative ways to calculate Nathaniel's interest in Grace's STRS benefits. Both alternatives "froze" the amount of Grace's monthly accrued benefit at $3,114, which was the amount Grace would receive if she had stopped working on June 30, 2003 (the de facto termination date) and then retired at age 66. Because the parties were married during the entirety of Grace's employment prior to June 30, 2003, Nesser had no need to employ the coverture fraction to determine the marital portion of the STRS benefits. Under Nesser's calculations, 100 percent of the $3,114 accrued monthly benefit was marital property.

{¶ 16} On June 30, 2009, the trial court issued a judgment entry/decree of divorce. In it, the trial court found Napoli's method of dividing Grace's STRS pension more equitable, and it ordered the parties to prepare a DOPO assigning Nathaniel benefits in a manner consistent with Napoli's method. The trial court, however, failed to otherwise divide the marital property. When the parties

---

3. Through the issuance of a DOPO, a trial court can order the administrator of a public-retirement program to distribute benefits divided by a decree of divorce directly to a nonmember ex-spouse. R.C. 3105.80 et seq.; *Green v. Green*, 10th Dist. No. 04AP–61, 2005-Ohio-851, 2005 WL 468234, ¶ 4.

brought this omission to the trial court's attention, the court issued a nunc pro tunc judgment entry/decree of divorce. In the July 21, 2009 corrected judgment, the trial court distributed all the marital property.

{¶ 17} Grace appealed the July 21, 2009 judgment to this court. Prior to appeal, neither party submitted a DOPO to the trial court for approval and entry. On appeal, Nathaniel argued that the lack of a DOPO meant the July 21, 2009 judgment was not yet a final, appealable order. *Thompson v. Thompson*, 10th Dist. No. 09AP–722, 2010-Ohio-2730, 2010 WL 2396654, ¶ 3–4. We agreed and dismissed the appeal. Id. at ¶ 5–6.

{¶ 18} Back before the trial court, Nathaniel moved for Civ.R. 60(B) relief from the June 30 and July 21 judgments. Nathaniel asserted that a nunc pro tunc entry could not correct substantive error; namely, the failure to completely divide the marital property. Consequently, Nathaniel requested that the trial court vacate the previous judgments and issue a definitive judgment that resolved all issues before the court.

{¶ 19} The trial court granted Nathaniel's motion. On January 27, 2011, the trial court issued an amended judgment entry/decree of divorce that granted the parties a divorce, distributed their assets, and ordered Nathaniel to pay Grace $2,938.78 to equalize the distribution of marital property. As in the previous two judgments, the trial court found Napoli's division of Grace's STRS pension more equitable, and it ordered the parties to prepare a DOPO that included the figures that resulted from Napoli's calculations. The trial court also ordered Grace, upon retirement, to elect a joint and survivor annuity that would provide Nathaniel with a survivorship benefit of 32 percent of her monthly accrued benefit.[4] Next, the trial court required Grace to designate Nathaniel the beneficiary of 50 percent of the survivor benefit that would arise if she died prior to retirement. Finally, the trial court ordered:

> [I]f Mrs. Thompson should decide to defer her retirement beyond the date when she could retire with a pension equal to 100% of the High 3–year Final Average Salary (July 1, 2014), then she shall make Mr. Thompson whole by paying him directly the monthly retirement benefits he would otherwise have been entitled to receive until such time as he is entitled to receive direct payments from the Plan.

{¶ 20} Grace now appeals from the January 27, 2011 judgment, and she assigns the following errors:

> I. The trial court erred by applying the coverture method to Mrs. Thompson's STRS account because it granted Mr. Thompson an interest in the STRS

---

4. As the survivorship benefit is not calculated using the coverture fraction, the amount that Nathaniel should receive decreases from 42 to 32 percent of the monthly accrued benefit.

account which included portions that were Mrs. Thompson's separate property in that they were acquired after the marriage terminated.

II.   The trial court erred by granting Mr. Thompson pre–retirement survivor coverage and survivorship coverage under Mrs. Thompson's STRS program.

III.   The trial court erred by obligating Mrs. Thompson to pay Mr. Thompson if she were to delay her retirement.

IV.   The trial court erred by refusing to uphold[ ] the parties' oral separation agreement regarding the reimbursement for the value of the Nissan Maxima and costs associated with health insurance and car insurance.

V.   The trial court erred by dividing the couple's personally managed retirement accounts, life insurance policies, and tangible property in an inequitable manner.

VI.   The trial court erred by deviating from the parties['] joint stipulations and not granting Mrs. Thompson any and all rights to her artistic, creative design, and written material.

{¶ 21} At oral argument, held September 13, 2011, Grace's attorney informed this court that Grace is now retired. Thus, as an initial matter, we must address whether Grace's retirement moots any of her assignments of error.

{¶ 22} Alleged error is moot if the issue presented is no longer "live" or the parties lack a legally cognizable interest in the resolution of the issue. *State ex rel. Gaylor, Inc. v. Goodenow,* 125 Ohio St.3d 407, 2010-Ohio-1844, 928 N.E.2d 728, ¶ 10. When an outside event has rendered a question moot, courts must exercise judicial restraint. *Tschantz v. Ferguson* (1991), 57 Ohio St.3d 131, 133, 566 N.E.2d 655. Thus, courts generally refrain from giving an advisory opinion on a moot question or ruling on a question of law that cannot affect matters at issue in the case. *Devine–Riley v. Clellan,* 10th Dist. No. 11AP–112, 2011-Ohio-4367, 2011 WL 3841957, ¶ 3. See also *Monroe v. Korleski,* 10th Dist. No. 10AP–718, 2011-Ohio-1784, 2011 WL 1486093, ¶ 9 ("As a general matter, courts will not resolve issues that are moot").

{¶ 23} In her second assignment of error, Grace argues in part that the trial court erred in ordering her to designate Nathaniel the beneficiary of 50 percent of the survivor benefit that STRS provides if a participant dies prior to retirement. Because Grace retired before dying, Nathaniel will never be entitled to the benefit at issue. Consequently, the portion of the second assignment of error attacking the award of preretirement survivor coverage is now moot.

{¶ 24} In her third assignment of error, Grace challenges the trial court's ruling that she would have to pay Nathaniel directly his portion of her STRS retirement benefits if she did not retire by July 1, 2014. Because Grace retired well before July 1, 2014, the disputed ruling will not affect her. We conclude,

therefore, that Grace's third assignment of error is moot. Tangentially, we note that both Grace's and Nathaniel's counsel concurred with this conclusion during oral argument.

{¶ 25} As courts generally do not resolve moot questions, we decline to rule on the relevant portion of the second assignment of error and the entirety of the third assignment of error.

■ {¶ 26} In her first assignment of error, Grace argues that the trial court erred in dividing her STRS pension using the coverture method on which Napoli relied, as opposed to the frozen method employed by Nesser. We disagree.

{¶ 27} In divorce proceedings, a trial court must classify property as marital or separate property. R.C. 3105.171(B). Then, the trial court must divide the marital property equally or, if an equal division is inequitable, the court must divide the marital property equitably. R.C. 3105.171(C)(1); *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 5. A trial court has broad discretion in the allocation of marital assets, and an appellate court will not disturb its judgment absent an abuse of discretion. Id.

■ {¶ 28} As a general rule, retirement benefits acquired during the marriage are marital assets. *Neville* at ¶ 6; *Erb v. Erb* (1996), 75 Ohio St.3d 18, 20, 661 N.E.2d 175; *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 178, 559 N.E.2d 1292. When distributing retirement benefits in a divorce, a trial court must apply its discretion based on the circumstances of the case; the status of the parties; the nature, terms, and conditions of the retirement plan; and the reasonableness of the result. *Erb* at 20; *Hoyt* at 179. The trial court must attempt to accomplish two goals: (1) preserve the optimum value of the retirement asset so that each party can procure the most benefit and (2) disentangle the parties' economic affairs to bring finality to the marriage. *Hoyt* at 179.

{¶ 29} Generally, employers offer two types of retirement plans. The plan at issue here is a defined-benefit plan, i.e., a pension plan whereby the member's benefit is defined by a plan formula that provides for the payment of a monthly check for life upon the member's retirement. *Hoyt* at 181, fn. 11 (listing the STRS plan as an example of a defined-benefit plan); 2 Sowald & Morganstern, Domestic Relations Law (4th Ed.Rev.2009) 633, Section 30:13 (defining a defined-benefit plan). Alternatively, an employer could offer a defined-contribution plan, such as a 401(k) plan, profit-sharing plan, money-purchase plan, thrift plan, or employee stock-option plan. *Hoyt* at 181, fn. 11. In a defined-contribution plan, the employee and/or employer contributes to the employee's account and the value of the plan is the account balance. Id. Unlike a defined-contribution plan, the amount of a member's contribution (if any) to a defined-benefit plan plays no

role in the computation of the value of the benefit. Rather, the value is determined from a formula that incorporates variables such as the member's age, service credit, and highest salary at retirement. *Pruitt v. Pruitt*, 8th Dist. No. 84335, 2005-Ohio-4424, 2005 WL 2046422, ¶ 53; Oldham, Separation and the Distribution of Property (2010) 7–64, Section 7.10[2][b].

{¶ 30} The extent of an employee's eligibility for pension benefits depends on whether the benefits are vested and/or mature. Vested pension benefits are not subject to forfeiture even if the employee leaves the employer. *Younkin v. Younkin* (Dec. 22, 1998), 10th Dist. No. 98AP–419, 1998 WL 894849; Oldham, Separation and the Distribution of Property (2010) 7–66–67, Section 7.10[3][b]. Pension benefits vest once the employee has been employed for a predetermined number of years. Oldham, Separation and the Distribution of Property (2010) 7–66, Section 7.10[3][b]. Under STRS's terms, pension benefits vest after five years of employment. R.C. 3307.58.[5] At the time of the amended judgment, Grace had taught for almost 35 years, so her pension benefits had vested.

{¶ 31} Pension benefits are mature when the plan provides for distribution and payments are currently due and payable to the employee. *Erb*, 75 Ohio St.3d at 20, 661 N.E.2d 175. Here, when the trial court divided the parties' assets, Grace's STRS pension benefits were not mature, because she had not yet retired.

{¶ 32} Where a trial court must distribute vested but unmatured pension benefits, it may determine the parties' proportional shares of the benefits at the time of the divorce, or it may defer the proportionality determination until the benefits mature. *Erb* at 21; *Hoyt*, 53 Ohio St.3d at 182, 559 N.E.2d 1292. In the latter situation, the trial court must reserve jurisdiction so that it can revisit the division of the pension benefits when they mature. Id.

{¶ 33} Whether a trial court divides the vested but unmatured pension benefits at the time of divorce or later, the court may value the benefits "by computing the ratio of the number of years of employment of the employed spouse during the marriage to the total years of his or her employment." Id. This ratio is often expressed as the coverture fraction. In the coverture fraction, the numerator is the number of years a pension member is employed during the marriage and the denominator is the number of years of total employment.

---

5. Retirement payments are not guaranteed to a member of a defined-benefit plan who has vested but unmatured benefits. If such a member dies before retirement, neither he nor his estate receives any benefit from the plan. Oldham, Separation and the Distribution of Property (2010) 7–67, Section 7.10[3][b]. Under STRS's terms, the right to receive retirement payments does not vest until STRS grants the retirement. *Cosby v. Cosby*, 96 Ohio St.3d 228, 2002-Ohio-4170, 773 N.E.2d 516, ¶ 11 (citing R.C. 3307.42).

*Smith v. Smith,* 182 Ohio App.3d 375, 2009-Ohio-2326, 912 N.E.2d 1170, ¶ 95; *Hasselback v. Hasselback,* 10th Dist. No. 06AP–776, 2007-Ohio-762, 2007 WL 549461, ¶ 11. Once a pension member retires, the defined-benefit-plan administrator multiplies the monthly accrued benefit by the coverture fraction. *Long v. Long,* 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, ¶ 60, fn. 6. The resulting sum is the marital portion of the pension benefit. Generally, the trial court will award the nonmember spouse half of that marital portion to achieve an equal division. *Meeker v. Skeels,* 6th Dist. No. L–09–1190, 2010-Ohio-3525, 2010 WL 2990702, ¶ 14; *Makar v. Makar,* 7th Dist. No. 02–CA–37, 2003-Ohio-1071, 2003 WL 927705, ¶ 20.

{¶ 34} Application of the coverture fraction enables identification and distribution of the marital portion of the pension. *Younkin,* 1998 WL 894849. If the member spouse continues to work after the divorce, the denominator of the coverture fraction grows, while the numerator remains static. Thus, each year the member spouse works after a divorce reduces the marital portion of the pension. 2 Sowald & Morganstern, Domestic Relations Law (4th Ed.Rev.2009) 657, Section 30:29. However, as the member spouse continues to work, the value of the overall pension continues to grow. Consequently, "with each passing year after the divorce, the [nonmember spouse] is earning a smaller percentage of a larger pie." Id.

{¶ 35} By granting the nonmember spouse a portion of the overall pension, the coverture fraction provides the nonmember spouse with inflationary protection. Id. Additionally, use of the coverture fraction furthers the trial court's goal of procuring the most value for both parties because its application divides the value of the pension at retirement, when value often peaks. *Carbon v. Carbon* (Sept. 20, 2000), 7th Dist. No. 98 C.A. 211, 2000 WL 1513725.

{¶ 36} Here, the trial court divided Grace's STRS pension using the coverture fraction to determine the marital portion of the pension. Grace first argues that the use of the coverture fraction resulted in Nathaniel's receiving contributions that she made to STRS after the termination of the marriage. Grace contends that these posttermination contributions are her separate property and, thus, are not subject to distribution.

{¶ 37} This argument is premised on a fundamental misunderstanding of the basis on which the trial court divided Grace's STRS pension. Although members of the STRS defined-benefit plan make contributions to STRS, the amount of the accrued benefit at retirement is not dependent upon the amount of the member's contributions. Rather, as we explained above, STRS determines the monthly accrued benefit using a formula that takes into account the member's years of service, the retirement percentage accumulated during those years, and the final average salary. R.C. 3307.58(B)(2). In its amended judgment, the trial court

distributed Grace's pension based on the value of the accrued benefit Grace was entitled to, not the amount of contributions Grace made to STRS. Thus, the trial court did not award Nathaniel any of Grace's contributions to STRS, whether made before or after the divorce. Instead, the trial court awarded Nathaniel the marital portion of the value of Grace's accrued benefit.

{¶ 38} If we remove Grace's focus on contributions, her real complaint is that the application of the coverture fraction allows Nathaniel to share in the increase of the pension's value that occurred after the de facto termination date. Grace asserts that any increase in value after the de facto termination date should be her own separate property. Thus, Grace contends, the trial court erred by accepting Napoli's determinations of the pension's value because they were based on Grace's entire teaching career, not just those years Grace taught during the marriage. According to Grace, Nesser was correct when he froze the value of her pension on the de facto termination date.

{¶ 39} Ohio courts have recognized that the coverture fraction does, in fact, award the nonmember spouse a proportionate share of any postdivorce increase in the value of the member spouse's pension. *Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, at ¶ 60, fn. 6; *Sayson v. Sayson*, 2d Dist. No. 2005–CA–69, 2006-Ohio-2654, 2006 WL 1461076, ¶ 64. This feature of the coverture fraction, however, does not deprive the member spouse of her separate property or otherwise unfairly disadvantage the member spouse. As the court stated in *Layne v. Layne* (1992), 83 Ohio App.3d 559, 567, 615 N.E.2d 332:

[A] retirement plan is an investment made by both spouses during marriage to provide for their later years. They anticipate that the value of the investment will increase with time. At divorce, each spouse is entitled to the value of his or her investment. When the investment has not yet matured, each is entitled to a right to its value at maturity in proportion to the years of marriage. The [non-member] former spouse is not entitled to share in the direct contributions made by the [member] former spouse after divorce. However, the [non-member] former spouse is entitled to the benefit of any increase in the value of his or her unmatured proportionate share after divorce attributable to the continued participation of the other spouse in the retirement plan. That increase was contemplated when the investment was made. It would be inequitable to deprive the owner of its value. So long as each former spouse is limited to his or her proportionate right to share, there is neither unjust enrichment of the [non-member spouse] nor an inequitable deprivation of his or her rights.

{¶ 40} Based upon the above reasoning, numerous Ohio courts have rejected the argument that the coverture fraction illegally or unfairly awards the nonmember spouse with pension benefits earned after the divorce. See, e.g., *Sayson* at

¶ 66–68 (finding it fair and equitable to award a former spouse her share of the increased future value of a pension earned when the member spouse served 15 years of active military duty during the marriage); *Pruitt*, 2005-Ohio-4424, at ¶ 58 (rejecting the member spouse's argument that use of the coverture fraction improperly deprived him of benefits he earned subsequent to the divorce); *DiFrangia v. DiFrangia*, 11th Dist. No. 2003–T–0004, 2003-Ohio-6090, 2003 WL 22697977, ¶ 20–23 (holding that application of the coverture fraction did not result in a "future award" of nonmarital assets earned subsequent to the termination of the marriage); *Peters v. Peters* (Feb. 23, 2001), 2d Dist. No. 18445, 2001 WL 173214 (affirming the distribution to the nonmember spouse a share of an early retirement subsidy earned after the divorce that increased the value of the member spouse's pension).

{¶ 41} In *Younkin*, 1998 WL 894849, this court concurred with the reasoning set forth in *Layne*, 83 Ohio App.3d 559, 615 N.E.2d 332. The Younkins were married for over 25 years. The husband began participating in a pension plan offered by his employer one year after the Younkins' wedding, and he continued participation throughout the remainder of the marriage. If the husband had retired on the date of the divorce trial, his monthly accrued benefit would have been approximately $1,400. However, if the husband continued working for another three years, he would receive a 30–year subsidy, which would elevate his monthly accrued benefit to over $3,000. The trial court applied the coverture fraction to divide the pension, thus ensuring that the wife would receive a pro rata share of the 30–year subsidy.

{¶ 42} On appeal, the husband argued that the increase in his pension benefit due to the 30–year subsidy was not marital property, because he would earn it with postdivorce labor. We rejected this argument, holding:

> The increase [due to the 30–year subsidy] represents the unmatured asset attributable to the parties' continued participation in the retirement plan over the past twenty-five years. The presence of a contingency regarding the thirty-year subsidy does not alter the fact that the benefit was cultivated by the joint efforts of both spouses over twenty-five of the thirty years required for its maturity. Contrary to [the husband's] contention, [the husband] will not earn the thirty-year benefit solely over the last five years of his employment. Instead, the benefit "is a form of deferred compensation which is attributable to the entire period in which it was accumulated." Because the thirty-year subsidy is a marital asset, the trial court properly considered it in dividing the marital property.

(Citations omitted.) *Younkin.*

{¶ 43} Applying the foregoing precedent to this case, we conclude that the trial court did not abuse its discretion in using the coverture fraction to determine the

marital portion of Grace's STRS pension. The parties were married for 27 of the 35 years that Grace taught. The first 27 years of service were a necessary foundation for the later, postdivorce years of service. Absent those 27 years, Grace would have been unable to attain the increases in the retirement percentage accorded to her in years 30 to 35 of her employment. Because the value of Grace's accrued benefits accumulated over the course of all 35 years, Nathaniel should share in that value in an amount proportionate to the length of the marriage. We thus conclude that the trial court did not abuse its discretion in using the coverture fraction in valuing and distributing Grace's STRS pension.

{¶ 44} As a final matter, Grace contends that we should reverse the trial court's formula for dividing her STRS pension because until her retirement, the parties were unable to ascertain the exact amount of the monthly payment due to Nathaniel. While Grace is correct regarding the inexactitude inherent in the trial court's formula, the only unknown factor was the date of her retirement. Once Grace retired, STRS could apply the formula set forth in the DOPO to calculate the amount due. Therefore, the formula does not entangle the parties' financial affairs to the extent that an abuse of discretion results. See *Mann v. Mann*, 4th Dist. No. 09CA38, 2011-Ohio-1646, 2011 WL 1233325, ¶ 21 (holding that the failure to completely disentangle the parties' financial affairs does not constitute an abuse of discretion).

{¶ 45} In sum, we conclude that the trial court did not abuse its discretion in relying upon Napoli's calculations to value and divide Grace's STRS pension. Accordingly, we overrule Grace's first assignment of error.

{¶ 46} With regard to Grace's second assignment of error, we held above that the portion of the assignment challenging the preretirement survivor benefit is moot. We thus turn to the remaining portion, in which Grace argues that the trial court erred in ordering her to select a joint and survivor annuity when she retired, and designate Nathaniel the beneficiary to 32 percent of her benefit if she predeceases him. We find this argument unavailing.

{¶ 47} Because trial courts must strive to divide the marital property so as to disentangle the affairs of the parties, courts "should only make an award of survivorship benefits, where a plan provides for such, under limited circumstances." *Hoyt*, 53 Ohio St.3d at 185, 559 N.E.2d 1292. However, in order to preserve the retirement asset so that each party can procure the most benefit, "the equity of the circumstances may warrant the awarding of survivorship benefits, or a portion of them, to a former spouse." Id.

{¶ 48} Here, both parties agreed that the trial court should defer distribution of the STRS pension benefits until Grace's retirement. Under STRS's terms, upon retirement, a member must select a plan of payment. R.C. 3307.60(A). If a

member selects a single lifetime annuity, benefit payments cease when the member dies. Grace's STRS pension was one of the parties' largest marital assets. To ensure that Grace's premature death would not prevent Nathaniel from receiving his full share of the pension, the trial court ordered Grace to opt for a joint and survivor annuity. Such an annuity provides for payments to a designated beneficiary for the lifetime of the beneficiary. Id. Thus, Grace's death will not cut off the flow of Nathaniel's portion of the pension benefits to him if he outlives her. We conclude that under these circumstances, the trial court did not abuse its discretion with its order. See *Purdy v. Purdy*, 12th Dist. No. CA2002–11–089, 2003-Ohio-7214, 2003 WL 23095483, ¶ 32 (finding no abuse of discretion in requiring the election of a joint and survivor annuity because "[s]uch a division ensures that the benefits [the nonmember spouse] receives under the plan will not cease if she outlives [the member spouse]").

{¶ 49} In arguing against this conclusion, Grace contends that it was unfair for the trial court to grant Nathaniel a survivorship interest in her pension when it did not give her a survivorship interest in his Social Security benefits. Actually, Grace received no interest in Nathaniel's Social Security benefits because those benefits are not subject to division in a divorce proceeding. *Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, at ¶ 8. As the trial court could not award Grace any interest in the Social Security benefits, it, consequently, could not award her a survivorship interest in those benefits.[6]

{¶ 50} Tangentially, we note that even though the trial court could not divide Nathaniel's future Social Security benefits, it could consider them when distributing the parties' marital assets. *Neville* at syllabus. In devising an equitable division of Grace's pension, Napoli subtracted the value of the marital portion of Nathaniel's Social Security benefits from the value of the marital portion of Grace's STRS pension. Due to this offset, Nathaniel received less than 50 percent of the marital portion of Grace's pension. Thus, by adopting Napoli's method for dividing Grace's pension, the trial court accounted for Nathaniel's future Social Security benefits to arrive at an equitable allocation of Grace's pension.

{¶ 51} In sum, we find no abuse of discretion in the trial court's order that Nathaniel receive postretirement survivor coverage. Accordingly, we overrule the portion of Grace's second assignment of error that is not moot.

---

6. Regardless of the lack of such an award, Grace may still qualify for survivorship benefits under the Social Security Act. If Nathaniel predeceases Grace, she will be a "surviving divorced wife," i.e., "a woman divorced from an individual who has died, but only if she had been married to the individual for a period of 10 years immediately before the date the divorce became effective." Section 416(d)(2), Title 42, U.S.Code. Under Section 402(e), Title 42, U.S.Code, a surviving divorced wife can receive survivorship benefits if she satisfies the listed criteria. We express no opinion regarding whether Grace might be able to meet the criteria.

{¶ 52} In Grace's fourth assignment of error, she argues that the trial court erred in not allocating to her additional marital assets to reimburse her for her interest in an automobile once owned by the parties and the cost of health and automobile insurance for Nathaniel. We disagree.

{¶ 53} In early 1997, Grace decided that she wanted to exercise more financial autonomy. Therefore, at her suggestion, the parties opened a bank account to which they both contributed and from which they paid joint expenses, such as the mortgage and utilities. The parties deposited any amounts remaining from their paychecks into their "individual" bank accounts.

{¶ 54} During 1997, the parties had only one automobile—a 1989 Nissan Maxima. Grace decided that she wanted an automobile for her own use. According to Grace, the parties agreed that Grace would purchase an automobile using funds from her "individual" bank account and that Nathaniel would assume sole use of the Maxima. Nathaniel would then pay Grace $3,500 for her half of the Maxima's value. Although Grace purchased a Toyota Camry and Nathaniel retained the Maxima, Nathaniel did not pay Grace $3,500.

{¶ 55} Additionally, when the parties were in the process of "divvying things up" in early 1997, the parties agreed that Nathaniel would remain on the health insurance Grace received through her employer. According to Grace, Nathaniel agreed to reimburse her for the cost difference between a single policy and a family policy.

{¶ 56} Finally, in 2001, Nathaniel purchased a Porsche, which increased the cost of the parties' automobile insurance. Prior to that point, each party was paying for "their" half of the insurance from the joint account. Because Nathaniel owned two of the three automobiles covered by the policy (the Maxima and the Porsche), Grace believed that Nathaniel should be responsible for two-thirds of the cost of the insurance. According to Grace, Nathaniel agreed to pay her $724.50 to reimburse her for the increased insurance cost due to his purchase of the Porsche.

{¶ 57} By "splitting" their assets in 1997, the parties were attempting to transform a portion of their marital assets and liabilities into separate assets and liabilities. The agreements at issue arose from Grace's efforts to maintain that separateness. In Grace's view, for the Maxima to become Nathaniel's separate property, he owed her half of the value of the automobile because the couple had purchased it with "joint" funds. Likewise, Nathaniel had to pay "his" separate part of the marital debt for health and automobile insurance.

{¶ 58} However, spouses cannot by agreement convert marital assets and debt into separate assets and debt, unless the agreement is pursuant to an immediate separation. R.C. 3103.06 ("A husband and wife cannot, by any

contract with each other, alter their legal relations, except that they may agree to an immediate separation and make provisions for the support of either of them and their children during the separation"); *Blair v. Blair* (Mar. 5, 2002), 3d Dist. No. 9–01–36, 2002 WL 359470 (holding that the trial court erred in finding that marital property was the former wife's separate property based on a nonseparation agreement in which the former husband purported to relinquish any interest in the marital property). " 'R.C. 3103.06 prohibits post-nuptial contracts, unaccompanied by a separation agreement, that alter the parties' legal rights.' " *Blair*, quoting *King v. King* (Mar. 20, 2000), 4th Dist. No. 99 CA 680, 2000 WL 326131.

{¶ 59} Here, the parties reached their agreements in 1997 and 2001, but they did not separate until 2003. Because years passed between the agreements and the separation, the agreements are not separation agreements exempt from the operation of R.C. 3103.06. *Blair*; *Carlisle v. T & R Excavating, Inc.* (1997), 123 Ohio App.3d 277, 285–286, 704 N.E.2d 39. The agreements, therefore, are void, and the trial court did not err in refusing to enforce them. Accordingly, we overrule Grace's fourth assignment of error.

{¶ 60} In her fifth assignment of error, Grace argues that the trial court erred in failing to divide the marital property (excluding her STRS pension) equitably. We disagree.

{¶ 61} In the case at bar, the parties stipulated to the value of their Vanguard IRA accounts, joint checking and savings accounts, Grace's NEA annuity, Grace's MBNA money market account, Grace's life insurance policy, Nathaniel's 401(k) account, Nathaniel's life insurance policy, and Nathaniel's Vanguard money market account. Grace submitted evidence, which Nathaniel did not dispute, regarding the value of her Putnam IRA account. Finally, the parties agreed that Grace retained $4,760 of marital personal property and that Nathaniel retained $13,475 of marital personal property.

{¶ 62} The trial court used the undisputed values of the above assets to divide the marital property. The trial court also factored into its division of the marital property the proceeds resulting from the sale of the marital residence. After allocating the marital assets, the trial court determined that it had awarded Nathaniel $5,877.55 more than Grace. Consequently, the trial court ordered Nathaniel to pay Grace half of that amount, or $2,938.78, or equalize the property distribution.[7]

---

7. The court did not include Nathaniel's "PPA" retirement account in this calculation. However, the amended judgment equally divides that account between the parties. The trial court has signed a qualified domestic relations order requiring the administrator of the "PPA" retirement plan to pay 50 percent of the account balance to Grace when Nathaniel retires.

{¶ 63} On appeal, Grace asserts that the property distribution is not equal and that, to accomplish an equal distribution, Nathaniel must pay her an additional $24,911.12. Grace's computation is flawed because it does not include all the marital assets. Grace omits from her computation Nathaniel's Vanguard money market account ($14,083.50) and her MBNA money market account ($46,788.76). When these assets are incorporated into the division of the marital assets, a payment of only $2,938.78 is necessary to equalize the asset distribution.

{¶ 64} Next, Grace argues that the trial court erred in not tipping the division of marital assets in her favor because she suffers from medical problems. "In any divorce action, the starting point for a trial court's analysis is an equal division of marital assets." *Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, at ¶ 5 (citing R.C. 3105.171(C)). Only if an equal division would be inequitable does a trial court divide the marital property in an unequal, but equitable, fashion. Id.; R.C. 3105.171(C)(1). In the case at bar, the trial court equalized the division of marital property. We cannot conclude that this decision was an abuse of discretion. Both parties suffer from medical problems, so the trial court did not act unreasonably, arbitrarily, or unconscionably in refusing to favor one party over the other in the division of the marital property.

{¶ 65} Finally, Grace criticizes the trial court because it allocated the parties' marital property largely through a table attached to the amended judgment. Even if we found this criticism valid, it would not be a basis on which to reverse the amended judgment. Pursuant to App.R. 12(A)(1)(b), appellate courts must "[d]etermine [an] appeal on its merits on the assignments of error set forth in the briefs under App. R. 16." Thus, generally, appellate courts will rule only on assignments of error, not mere arguments. *Ellinger v. Ho,* 10th Dist. No. 08AP–1079, 2010-Ohio-553, 2010 WL 596978, ¶ 70. As the instant argument does not correlate with any of Grace's assignments of error, we decline to consider it.

{¶ 66} In sum, we conclude that the trial court did not abuse its discretion in dividing the parties' marital property. Accordingly, we overrule Grace's fifth assignment of error.

{¶ 67} In Grace's sixth assignment of error, she argues that the trial court erred in not adhering to a joint stipulation regarding her retention of "all rights to any and all artistic, creative design, written material such as lesson plans and curriculum." We disagree.

{¶ 68} Initially, we note that the parties' counsel informed this court at oral argument that the parties would attempt to resolve this issue out of court. Nathaniel's counsel told this court that he has no interest in laying claim to any of the property that is the subject of the joint stipulation. Nevertheless, having

received no notification from the parties that they have, in fact, reached a resolution on this issue, we must decide it.

{¶ 69} A stipulation is a voluntary agreement entered into between opposing parties concerning the disposition of some relevant point. *Sherman v. Sherman*, 10th Dist. No. 05AP–757, 2006-Ohio-2309, 2006 WL 1280893, ¶ 11. Although parties may stipulate to facts, they may not stipulate to what the law requires. *Wilson v. Harvey*, 164 Ohio App.3d 278, 2005-Ohio-5722, 842 N.E.2d 83, ¶ 15. Consequently, stipulations to a question of law do not bind courts. *State ex rel. Finkbeiner v. Lucas Cty. Bd. of Elections*, 122 Ohio St.3d 462, 2009-Ohio-3657, 912 N.E.2d 573, ¶ 18 (stating that "this court is not bound by the parties' stipulation on [a] legal issue"); *Aulizia v. Westfield Natl. Ins. Co.*, 11th Dist. No. 2006–T–0057, 2007-Ohio-3017, 2007 WL 1732382, ¶ 14, fn. 2 ("While courts are ordinarily bound by the factual stipulations of litigants, courts are not bound in their determination of questions of law."); *In re Petition of Stratcap Invests., Inc.*, 154 Ohio App.3d 89, 2003-Ohio-4589, 796 N.E.2d 73, ¶ 8, fn. 1 ("[A] court is not bound by a stipulation insofar as it relates to a question of law").

{¶ 70} Here, the parties stipulated that Grace "retains all rights to any and all artistic, creative design, written material such as lesson plans and curriculum." In its amended judgment, the trial court awarded Grace "all interest in her written materials, created by her including but not limited to lesson plans and curriculum." The appropriate allocation of property is an issue for a trial court to resolve as a matter of law. R.C. 3105.171(B), (C), and (D). Consequently, in deciding between themselves which party would retain marital property, the parties stipulated to a legal question. We conclude, therefore, that the trial court was not bound to adopt the stipulation, much less to follow it verbatim. Accordingly, we overrule Grace's sixth assignment of error.

{¶ 71} For the foregoing reasons, we find a part of Grace's second and all of Grace's third assignments of error moot due to her retirement. We overrule Grace's first, the remaining part of her second, fourth, fifth, and sixth assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

Judgment affirmed.

FRENCH and DORRIAN, JJ., concur.