[Cite as *Harrington v. Ford*, 2015-Ohio-3571.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Freda J. Ford n.k.a. Harrington, | : | |
| Plaintiff-Appellee, | : | No. 14AP-954 |
| | | (C.P.C. No. 92DR-4702) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Harold M. Ford, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 1, 2015

*Strip, Hoppers, Leithart, McGrath & Terlecky, Co., LPA*, **and** *Joel R. Campbell*, **for appellee.**

*Barry W. Epstein,* **for appellant.**

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Harold M. Ford, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, directing plaintiff-appellee, Freda J. Ford n.k.a. Harrington ("Harrington"), to prepare an appropriate court order regarding the division of Ford's retirement benefits in connection with the parties' divorce. For the reasons that follow, we affirm in part and reverse in part.

### I. Facts and Procedural History

{¶ 2} The parties in this matter were married on August 24, 1974, and divorced on October 22, 1993, by way of an agreed judgment entry—decree of divorce (the "decree"). As pertinent here, the decree contains the following paragraph:

> The husband and the wife agree that Defendant's [Ford's] Civil Service Retirement System and USAF/OANG Retirement, if any, shall be divided equally between the parties. Defendant shall transfer one half of his said retirement accounts to Plaintiff [Harrington] by execution of the appropriate order or document. The court shall retain jurisdiction to execute an appropriate Qualified Domestic Relations Order or other order to provide allocation of one half of said funds to Plaintiff as of October 22, 1993.

(Decree, 6.)  Another paragraph of the decree required Harrington to pay $7,000 to Ford upon her sale of the marital residence.  No qualified domestic relations order ("QDRO") or other order providing for the allocation of Harrington's portion of Ford's retirement account was entered by the trial court following the filing of the decree.

{¶ 3}  In 1997 the parties executed an agreed judgment entry which, among other things, ordered Ford to cooperate to effectuate the QDRO.  Ford, a participant in the Civil Service Retirement System ("CSRS"), retired from federal government work in February 2009 without a QDRO or other order in place providing for the allocation of Harrington's portion of his retirement account.  Ford began to receive monthly retirement payments in March 2009.  After Ford's retirement, QDRO Consultants Company, LLC, prepared a draft court order acceptable for processing ("COAP").  The draft COAP provided that Harrington would have received an amount equal to 24.75 percent of Ford's monthly benefit under the CSRS plan.  Ford did not approve the draft COAP and it was thus not signed and filed by the trial court.  In January 2011, Harrington filed a motion requesting a court order effectuating the transfer of a portion of Ford's retirement account as set forth in the decree.  In July 2012, Ford filed a motion for contempt, alleging Harrington failed to comply with the requirement that she transfer $7,000 upon the sale of the marital residence.

{¶ 4}  Both the motion relating to the retirement account and the motion for contempt were heard by a magistrate of the trial court on August 28, 2012.  In March 2014, the magistrate issued a decision on the motions.  In September 2014, the magistrate issued an amended decision, attaching expert reports provided by the parties, which were not included with the original decision.  As to the division of Ford's retirement account, the magistrate determined Harrington is entitled to $27,503.88, or one-half of the value

of Ford's retirement account as of October 22, 1993, the date of divorce. The magistrate also found Harrington to be in contempt for failing to provide Ford with $7,000.00 upon the sale of the marital property, and, thus, ordered Harrington to pay Ford the $7,000.00 as an offset to the $27,503.88 owed to Harrington.

{¶ 5} Harrington filed objections to the magistrate's amended decision, and Ford filed a memorandum in opposition to Harrington's objections. Without further hearing, the trial court issued a decision on Harrington's objections on October 20, 2014. As to the division of Ford's retirement account, the trial court analyzed the proper characterization and treatment of Ford's retirement benefits. The trial court found the magistrate correctly determined the "frozen coverture method" applies, but the magistrate did not properly apply that method in this matter. (Oct. 20, 2014 Entry, 4.) The trial court determined Harrington is entitled to monthly benefit payments from Ford's retirement plan administrator in the amount of $633.46 as of August 1, 2013, the benefit of any cost of living adjustments that may occur in the future, and an additional $190.27 per month to compensate Harrington for monthly benefits already due but not yet paid. Lastly, the trial court agreed with the magistrate's finding of contempt and, based on this finding, determined that Ford shall keep Harrington's portion of the monthly retirement benefit payments received between January 1 and November 1, 2014, which totaled approximately $7,000.00 The trial court directed Harrington to prepare an appropriate order dividing the retirement benefits consistent with its decision.

{¶ 6} Ford filed a notice of appeal, and Harrington filed a notice of cross-appeal.[1]

## II. Assignments of Error

{¶ 7} Ford assigns the following errors for our review:

> [1.] The trial court failed to adhere to a proper standard of review for property division in a divorce and thus erred by modifying the divorce decree in violation of R.C. 3105.171(I).

> [2.] The trial court erred by ordering a decision contrary to *Hoyt v. Hoyt* [53 Ohio St.3d 177, 178 (1990)] when it failed to reach a reasonable result and failed to disentangle the parties' economic partnership, even after 20 years.

---

[1] Harrington subsequently filed a motion to withdraw her notice of cross-appeal which this court granted.

[3.] The trial court erred by granting [Harrington] an inequitable order contrary to evidence and the decree of divorce.

## III. Discussion

{¶ 8} Because they are interrelated, we will address Ford's three assignments of error together. In his first assignment of error, Ford argues the trial court erroneously modified the original order of division of marital property as set forth in the decree. Ford's second assignment of error alleges the trial court's decision does not reach a reasonable result and fails to disentangle the parties' economic partnership. Lastly, Ford argues the trial court's decision is inequitable. Collectively, Ford's assignments of error allege the trial court erroneously modified the decree by awarding Harrington monthly payments that, based on his life expectancy, far exceed the amount originally awarded in the decree.

{¶ 9} In divorce proceedings, a trial court must classify property as marital or separate property. R.C. 3105.171(B). Pension and retirement benefits earned during a marriage are marital assets. R.C. 3105.171; *Cameron v. Cameron*, 10th Dist. No. 12AP-349, 2012-Ohio-6258, ¶ 9; *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178 (1990). A pension that the participant spouse holds will not necessarily be subject to direct division between the participant spouse and the nonparticipant spouse, but it will be " 'subject to evaluation and consideration in making an equitable distribution of both parties' marital assets.' " *Cameron* at ¶ 9, quoting *Hoyt* at 180. When distributing retirement benefits in a divorce, a trial court must apply its discretion based on the circumstances of the case; the status of the parties; the nature, terms, and conditions of the retirement plan; and the reasonableness of the result. *Erb v. Erb*, 75 Ohio St.3d 18, 20 (1996); *Hoyt* at 179. The trial court must attempt to accomplish two goals: (1) preserve the optimum value of the retirement asset so that each party can procure the most benefit and (2) disentangle the parties' economic affairs to bring finality to the marriage. *Id.* at 179.

{¶ 10} A trial court's decision regarding the division of marital property is reviewed under the abuse of discretion standard. *See, e.g.*, *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, ¶ 27 (10th Dist.). A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner. *Blakemore v. Blakemore*, 5

Ohio St.3d 217, 219 (1983).   There is no abuse of discretion where there is some competent, credible evidence supporting the trial court's decision. *Ross v. Ross*, 64 Ohio St.2d 203 (1980).

{¶ 11} After a trial court issues a divorce decree, it lacks jurisdiction to modify or amend the marital property division, including the division of a pension fund, unless the parties expressly consent in writing to the modification.   R.C. 3105.171(I); *Cameron* at ¶ 10.   But a trial court retains "full power" to enforce the provisions incorporated into a divorce decree.   *Id.*   To effectuate and enforce a divorce decree's division of a pension, a domestic relations court must enter an order such as a QDRO, a division of property order, or similar device.   *Id.* at ¶ 12.   As long as such a device is consistent with the decree, it is not a modification of the decree.   *Id.*, citing *State ex rel. Sullivan v. Ramsey*, 124 Ohio St.3d 355, 2010-Ohio-252, ¶ 19.   Thus, when the parties "dispute, in good faith, the meaning of a provision in a decree, or if the provision is ambiguous, the trial court has the power to hear the matter, to resolve the dispute, and to enforce the decree."   *Robins v. Robins*, 10th Dist. No. 04AP-1152, 2005-Ohio-4969, ¶ 13.   The trial court has the power to clarify and construe its original decree if necessary, or simply enforce the decree as written if no ambiguity exists.   *Cameron* at ¶ 11.

{¶ 12} Retirement plans are generally classified as either a defined-benefit plan or a defined-contribution plan.   *Thompson* at ¶ 29.   Pursuant to a defined-benefit plan, the member or participant's benefit is defined by a plan formula that provides for the payment of a monthly check for life upon the member's retirement.   *Id.* at ¶ 29.   "Unlike a defined-contribution plan, the amount of a member's contribution (if any) to a defined-benefit plan plays no role in the computation of the value of the benefit."   *Id.*   The actual value of a defined-benefit plan that is the subject of a court's equitable distribution can be determined only by future contingencies such as the participant's age, highest salary at retirement, and pension service credits at retirement.   *Id.*; *Pruitt v. Pruitt*, 8th Dist. No. 84335, 2005-Ohio-4424, ¶ 53.   Pursuant to a defined-contribution plan, such as a 401(k) plan, profit-sharing plan, money-purchase plan, thrift plan, or employee stock-option plan, the employee and/or employer contributes to the employee's account and the value of the plan is the account balance.   *Hoyt* at 181, fn. 11.

{¶ 13} Eligibility to receive pension benefits depends on whether the benefits are vested and mature. *Thompson* at ¶ 30. Pension benefits vest once the employee has been employed for a predetermined number of years, and vested pension benefits are not subject to forfeiture even if the employee leaves the employer. *Id.* at ¶ 30. Pension benefits are mature when the plan provides for distribution and payments are currently due and payable to the employee. *Id.* at ¶ 31, citing *Erb* at 20. Conversely, pension benefits are not mature when payment is delayed until some future date. *Erb* at 20. A trial court's division of pension benefits, effectuated by a QDRO or similar order, must not violate terms of the plan. *Id.*

{¶ 14} Regarding the method of dividing Ford's retirement account, the parties agree that the decree unambiguously requires the division of Ford's pension using the frozen coverture method and not the traditional coverture method. Pursuant to the traditional coverture method, the non-participant spouse benefits from the increase in the value of his or her unmatured proportionate share after divorce that is attributable to the continued participation of the other spouse in the retirement plan. *See Thompson* at ¶ 39. As the participant spouse continues to work beyond the date of divorce, the amount of the monthly benefit to be received at retirement continues to grow because of the increase in years of service and likely increases in salary. *Id.* at ¶ 34. In contrast to the traditional coverture method, application of the frozen coverture method "freezes" the salary and years worked of the participant spouse for the purpose of determining the monthly retirement benefit payable at maturity. In this way, the frozen coverture method captures the "value of the participant spouse's retirement account had he or she retired on the same day the parties divorced, using the then-present base pay and years of service." *Cameron* at ¶ 17.

{¶ 15} Ford's employment with the federal government was covered under the Civil Service Retirement Act, 5 U.S.C. 8331 et seq., which established the CSRS. The CSRS is administered by the United States Office of Personnel Management. 5 U.S.C. 8347(a). Federal regulations grant state courts exclusive jurisdiction over all disputes regarding court orders awarding benefits under the CSRS to former spouses. 5 C.F.R. 838.122(e). "A court order acceptable for processing (COAP) is required by federal regulations in order for OPM to distribute, as provided for in a state court decree of

divorce, a marital share of a party's CSRS pension to a person other than the federal employee." *Plachy v. Plachy*, 652 S.E.2d 555, 556 (Ga.2007), fn. 1, citing 5 U.S.C. 8345(j)(1); 5 C.F.R. 838.101, 838.303 to 838.306. Retirement benefits under the CSRS are generally received as monthly annuity payments. 5 U.S.C. 8311(2). In some circumstances, a former spouse may receive a survivor annuity, but a former spouse is generally precluded from receiving a survivor annuity if he or she is remarried before reaching 55 years of age. *See* 5 U.S.C. 8341 (governing CSRS survivor annuities). Additionally, if the total annuity paid to a participant prior to his or her death is less than the amount contributed to the CSRS by the participant, the difference is paid out to a designated beneficiary or other person as set forth by statute. 5 U.S.C. 8342(c) and (e).

{¶ 16} In this appeal, there is no dispute that the CSRS is a defined-benefit plan, and that, on the date of the divorce, Ford's benefits thereunder were vested, but not mature. There is also no dispute Harrington would not be entitled to any former spouse survivor annuity payments because she remarried before reaching 55 years old. Moreover, as noted above, both parties agree the decree unambiguously requires the division of Ford's CSRS pension using the frozen coverture method. The dispute in this appeal, however, centers on whether the trial court's decision, directing Harrington to prepare an appropriate court order dividing Ford's CSRS pension, properly applied the retirement benefits division provision of the decree. Thus, the disagreement resolves to whether the trial court properly applied the frozen coverture method to determine the amount Harrington should receive from the Office of Personnel Management based on her marital portion of Ford's CSRS pension.

{¶ 17} Ford argues Harrington is only entitled to one-half the value of his retirement benefits as of October 22, 1993, the date of divorce. Ford contends that, as of October 22, 1993, the value of his retirement benefits was $30,083.05, which was the amount of retirement contributions deducted from Ford's pay until 1993, according to the Office of Personnel Management. This contention demonstrates a misunderstanding of the characteristics of a defined-benefit plan. Because Ford's retirement contributions went into a defined-benefit plan, the amount of his contributions did not determine the value of the benefit he would receive upon retirement. *See Thompson* at ¶ 29. The value of the pension is determined by accounting for variables such as the member's age, years

of service, and salary. *Id.* Thus, Ford's reliance on the amount of his retirement contributions as of October 1993 is unpersuasive.

{¶ 18} In the alternative, Ford asserts that the value of his CSRS account as of October 22, 1993, was at most $55,007.76, which was the estimated value placed on Ford's pension as of October 22, 1993 by Harrington's expert. Ford argues Harrington is only entitled to one-half of that amount. The magistrate agreed with this logic and awarded Harrington one-half of the estimated value of Ford's pension as of October 22, 1993, $27,503.88, reduced by the $7,000.00 owed to Ford in relation to the sale of the marital residence. The trial court rejected this approach as being inconsistent with application of the frozen coverture method mandated by the decree. We find the trial court's ruling on this issue to be reasonable and consistent with applicable law and the expert reports provided by the parties.

{¶ 19} Harrington's expert, Pension Evaluators, a division of QDRO Consultants, determined Ford's accrued annual pension, as of October 22, 1993, to be $14,429.40, based on his years of service and final average salary as of that date. That is, if Ford had stopped working for the federal government on October 22, 1993, he would have been entitled to receive $14,429.40 per year, or $1,202.45 per month, when the pension matured. *See Cameron.* To determine the value of the pension as of October 22, 1993, Pension Evaluators multiplied $14,429.40 by the applicable present value of deferred annuity factor, 3.8122. In this manner, Pension Evaluators determined the "estimated value" of Ford's pension to be $55,007.76 as of October 22, 1993. However, Pension Evaluators also determined that one-half of the "frozen benefit," or $1,202.45 per month, is $601.23. This monthly payment amount constitutes Harrington's marital portion of the unmatured benefit that had accrued as of the date of the divorce.

{¶ 20} As part of the proceedings before the magistrate, Ford submitted a report of his expert, Al Minor & Associates, Inc. Al Minor & Assoc. opined that the "divorce decree back in 1993 indicated that half of [Ford's] accrued pension at the date of divorce should be paid to [Harrington] at the time that [Ford] actually retired." (Al Minor & Assoc. Report, 1.) Al Minor & Assoc. acknowledged that Pension Evaluators determined the "accrued pension" to be $14,429.40 per year. Al Minor & Assoc. additionally stated, "[Harrington] would be entitled to half of that, which would amount to $601.23 per

month." (Al Minor & Assoc. Report, 1.) Thus, Ford's expert did not dispute Pension Evaluators' frozen benefit calculation. Thus, the undisputed evidence before the trial court indicated that if Ford had stopped working on October 22, 1993, one-half of the benefit to which he would have been entitled to, upon the benefit maturing, would have been $601.23.

{¶ 21} The trial court's decision is consistent with the reports of the parties' experts, and it recognizes that the decree provided that Harrington was entitled to one-half of the future monthly benefit already accrued as of the date of divorce. As set forth above, unlike the traditional coverture method, the frozen coverture method "freezes" the accrued, but unmatured, retirement benefits as of the date of divorce. That is, under the frozen coverture method, the value of the future monthly benefit is frozen because it does not gain value from years served after the divorce or increases in salaries after the divorce. Moreover, even Ford's own expert's report recognized the decree required an equal division of the accrued rights to future payments from CSRS; Ford's expert did not opine that Ford should pay Harrington one-half of the value of the pension as of the date of the divorce. The monthly benefit awarded to Harrington by the trial court is based on the calculation of her share of Ford's retirement account as if Ford had retired from federal government service on the date of divorce. *See Cameron.* Considering the reports of the parties' experts, and applicable case law, we find the trial court reasonably applied the frozen coverture method in determining Harrington's rightful portion of Ford's CSRS monthly annuity payments.

{¶ 22} We next address the trial court's decision to add $190.27 per month to the payments Harrington will receive going forward, as a means to compensate her for the missed payments. Accounting for cost of living increases, Ford's expert, Al Minor & Assoc., determined that, as of December 1, 2013, the value of Harrington's missed payments was $39,808.00 . Al Minor & Assoc. reasoned that, by using actuarial tables, this amount could be allocated over the life expectancy of Ford to compensate Harrington for the delay in her receiving payments. To this end, Al Minor & Assoc. further stated that Harrington's monthly benefit of $633.46 ($601.23 plus cost of living increases in 2012 and 2013) could be increased by $190.27 to account for her missed payments. However, Al Minor & Assoc. noted that tacking on the additional amount to the monthly payment to

Harrington assumes Ford survives as predicted by actuarial tables, and that Harrington survives to receive the payments. The trial court concurred with this approach and determined that $190.27 should be added to the base payment of $633.46 to compensate Harrington for the delay in her not receiving any payments since Ford began receiving monthly annuity payments; but, the trial court did not establish an end-date for the additional $190.27 per month.

{¶ 23} Although the additional amount of $190.27 per month was intended to compensate Harrington for the monthly payments she should have received once Ford began to receive monthly annuity payments, the payment of this additional amount should not extend indefinitely. Unlike the unknown duration of future annuity payments to the parties, the amount already paid to Ford is known. Harrington is entitled to a certain share of that amount. Based on the trial court's decision, should Ford survive beyond the time predicted in actuarial tables, the additional amount paid to Harrington would inequitably go beyond that needed to compensate Harrington for the missed payments. Attempting to address that scenario, Harrington asserts that if this court or the trial court later determines that the additional $190.27 per month paid to Harrington should be limited to the monthly payments over the next 17 years, an order could be issued to amend the COAP to return to the base payment amount if both parties are still living at that time. (Harrington's Brief, 13-14.)

{¶ 24} We view Harrington's suggested remedy to be inadequate. The repayment of the missed payments to Harrington should be limited to ensure Harrington will only be compensated for the value of the missed payments. At the same time, however, the trial court's order should ensure that Harrington will be fully compensated for those missed payments if Ford does not survive as predicted by the actuarial tables. Harrington's payments from CSRS will cease when Ford dies because she has no right to a former spouse survivor annuity. Additionally, even if the total annuity payments to Ford do not meet or exceed his contributions to CSRS upon his death, there is no suggestion by the parties that Harrington would be entitled to any of the payout should she survive him. Thus, based on the trial court's decision, if Ford does not survive as predicted by the actuarial tables, Harrington will not be fully compensated for the missed payments.

Accordingly, this matter must be remanded to the trial court to ensure certainty and fairness in the manner in which Harrington is compensated for the missed payments.

{¶ 25} For these reasons, Ford's first, second, and third assignments of error are overruled in part, and sustained in part.

## IV. Conclusion

{¶ 26} Having overruled in part, and sustained in part, Ford's first, second, and third assignments of error, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed in part and reversed in part. This matter is remanded to that court for the limited purpose of readdressing Ford's obligation to fully compensate Harrington for the missed payments.

*Judgment affirmed in part and reversed in part;*
*cause remanded with instructions.*

BROWN, P.J., and SADLER, J., concur.

———————————————